**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | |
|---|---|
| KIMBERLY BILLUPS, MICHAEL WARFIELD, and MICHAEL NOLAN, <br><br>            *Plaintiffs*, <br>v. <br><br>CITY OF CHARLESTON, SOUTH CAROLINA <br><br>            *Defendant*. | Civil Action No. 2:16-cv-00264-DCN |

**VERIFIED COMPLAINT FOR**
**DECLARATORY AND INJUNCTIVE RELIEF**

**INTRODUCTION**

1.  This civil-rights lawsuit seeks to vindicate the rights of tour guides in Charleston, South Carolina, under the First Amendment to the U.S. Constitution, so that they may earn a living by speaking on topics of their choice without first obtaining a special license from the government. Under Charleston's regulations, Plaintiffs are subject to fines and jail time if they talk to their customers without the City's permission. To obtain that permission, Plaintiffs must surmount a series of unnecessary bureaucratic hurdles—including the government's 200-question written exam and its oral exam. Plaintiffs are committed to leading high-quality, accurate, and entertaining tours. However, under the First Amendment, Plaintiffs are entitled to speak freely, without being subject to a licensing regime under which the government determines who may speak and who may not.

**JURISDICTION AND VENUE**

2.      Plaintiffs Kimberly Billups, Michael Warfield, and Michael Nolan (collectively, the "Plaintiffs"), bring this civil-rights lawsuit pursuant to the First Amendment to the U.S. Constitution; the Civil Rights Act of 1871, 42 U.S.C. § 1983; and the Declaratory Judgment Act, 28 U.S.C. § 2201.

3.      Plaintiffs seek declaratory and injunctive relief against enforcement of the tour-guide-licensing regime codified at Charleston Code of Ordinances ("Charleston City Code") §§ 29-58 to -63 and § 29-66, together with the definitions of "registered tour guide" and "temporary tour guide" contained in § 29-2, (collectively, the "licensing regime"), that violates the First Amendment to the U.S. Constitution.

4.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, 2201, 2202 and 42 U.S.C. § 1983.

5.      Venue lies in this Court pursuant to 28 U.S.C. § 1391.

**THE PARTIES**

6.      Plaintiff Kimberly Billups seeks to earn a living as a tour guide. Kimberly is not a licensed tour guide, and she thus cannot legally conduct tours in the City of Charleston. Were it not for Charleston's licensing requirement, Kimberly would immediately commence leading tours in the Charleston historic district under the business name "Charleston Belle Tours." Kimberly is a U.S. citizen and a resident of South Carolina.

7.      Plaintiff Michael Warfield seeks to work as a tour guide to supplement his income. Michael is not licensed as a tour guide, and he thus cannot legally conduct tours in the City of Charleston. In addition to working as an insurance broker, Michael serves as a volunteer at a historical landmark and museum. Were it not for Charleston's licensing requirement,

Michael would commence leading ghost and pub tours in the Charleston historic district. Michael is a U.S. citizen and a resident of South Carolina.

8. Plaintiff Michael Nolan is a retired editor in book publishing who seeks to work as a tour guide during his retirement. Michael is not licensed as a tour guide, and he thus cannot legally conduct tours in the City of Charleston. Were it not for Charleston's licensing requirement, Michael would commence leading tours in the Charleston historic district. Michael is a U.S. citizen and a resident of South Carolina.

9. Defendant City of Charleston ("City") is a municipal entity organized under the Constitution and laws of the State of South Carolina. Defendant is located at 80 Broad Street, Charleston, South Carolina.

### CHARLESTON'S TOUR-GUIDE-LICENSING REGIME

10. Charleston City Code § 29-58 makes it unlawful to "act or offer to act as a tour guide in the city for hire" without "pass[ing] a written and an oral examination" and being "licensed by the city[] . . . as a registered tour guide or a temporary tour guide."

11. Charleston's regulations define a "tour guide" as a "person who acts or offers to act as a guide for hire through any part of the districts . . . ." *Id*. § 29-2. A "registered tour guide" and a "temporary tour guide" are defined identically: "a person who has passed the examination and received the certificate." *Id*.

12. The City requires that every licensed tour guide "wear such tour guide license on his or her person in plain view at all times" when leading tours. *Id.* § 29-62. Tour guides are also required to have an "escort" assisting them—described as an individual "who may or may not be a licensed tour guide"—when tours are given to groups of twenty or more people. *Id*. § 29-261(a).

3

13. Violations of the City's licensing regime are punishable by fines up to $500 or by up to 30 days in jail, or both. *See Id*. § 1-16(a).

### Tour-Guide License

14. The City requires that prospective tour guides pass two examinations before qualifying for a tour-guide license: a written exam and an oral exam. Charleston City Code § 29-58.

15. Applicants must first pass the written exam before qualifying to take the oral exam. *Id.* § 29-59(g). Both exams "are meant to test the applicant's knowledge of the city and its history." *Id*. § 29-59(b).

16. The written exam consists of 200 questions. *See* Charleston Tourism Mgmt. Div., *Tour Guide Examination Information*, http://charleston-sc.gov/DocumentCenter/View/1655. The exam—composed of matching, multiple choice, and true/false questions—must be completed in two hours. *Id*. The City considers any score below an 80 percent on the written exam as a failing grade. Charleston City Code § 29-59(f).

17. Prospective tour guides who score an 80 percent or higher on the written exam must also pass the City's oral exam as a condition of licensure. *Id*. §§ 29-58, 29-59(f).

18. During the oral exam, government officials test prospective tour guides on "various sites around the City" by calling on them "at random" and requiring them "to act as a guide" for three minutes. *See Tour Guide Examination Information*, *supra*. The oral exam is held inside of a conference room at the Gaillard Auditorium on 2 George Street. *Id.* Government officials grade the oral exam on a pass or fail basis. Charleston City Code § 29-59(f).

19. The written and oral examinations are prepared by the City and based on materials approved by the Charleston Tourism Commission. *Id*. § 29-59(a).

20. The exam questions are generated from the Charleston Tour Guide Training Manual, a 490-page study guide sold at the City's Tourism Management Office for $45 plus tax. *See Tour Guide Examination Information*, *supra*.

21. The purpose of the Charleston Tour Guide Training Manual "is to provide a wealth of knowledge for prospective and current licensed tour guides" about Charleston's history in order to advance the "city's goal to provide accurate, factual and updated information to its visitors and residents." Vanessa Turner Maybank, Director of Tourism, *Tourism in Charleston*, *in* The City of Charleston Tour Guide Training Manual 482 (2011).

22. The manual and the City's exams have no relevance to the types of stories told on many tours. For instance, many tours offered in Charleston consist of ghost stories, folk knowledge, restaurant or pub recommendations, or information concerning the filming of Hollywood movies such as *The Notebook* and *The Patriot*. The City's exam does not test prospective tour guides on these subject areas.

23. All prospective tour guides must register with the City's Tourism Management Office and pay a $50 fee. *See Tour Guide Examination Information*, *supra*. Prospective tour guides are given two opportunities to take the written exam; after two tries, individuals who have not passed the written exam must re-register and pay another $50. *Id*. The written and oral examinations are given at least four times per calendar year. Charleston City Code § 29-59(d).

24. Tour-guide licenses expire three years following the date they are issued by the City. *Id*. § 29-63. Once a tour-guide license expires, the City treats previously licensed tour guides as "new applicant[s]" and requires them to satisfy "the requirement of examination" in order to obtain a new license. *See Id*. Failure to score an 80 percent or higher on the written

5

exam "will mean the guide will lose his or her license." *See* Charleston Tourism Mgmt. Div., *2016 Lecture Schedule*, http://www.charleston-sc.gov/DocumentCenter/View/3990.

25. Licensed tour guides wishing to avoid retaking the licensing examinations may extend the three-year expiration date of their license by taking yearly continuing education lectures. Charleston City Code § 29-63. The City requires the completion of four City-approved lectures before the end of the year in which a guide's license expires; lectures cost $40 for a series of four or $10 each. *See 2016 Lecture Schedule*, *supra*.

26. Tour guides with 25 years or more of experience "as a Charleston Licensed Guide" are exempt from the recertification process. *Id*.

## Temporary Tour-Guide License

27. The City issues temporary tour-guide licenses to prospective tour guides under certain conditions. Temporary tour-guide licenses are not renewable and may not be issued to the same person more than once. Charleston City Code § 29-60(d). Temporary licenses expire six months following the date of issuance or the date of the next regularly scheduled licensing exam, whichever is earlier. *Id*. § 29-60(b).

28. The City requires that all prospective tour guides seeking a temporary license be "sponsored and employed by persons who operate a licensed tour company . . . ." *Id*. § 29-60(a)(1). A temporary license automatically expires when a sponsoring employer ceases to employ a temporary license holder. *Id*. § 29-60(c).

29. Applicants must also pass a "temporary tour guide examination" administered by the City's Tourism Management Office. *Id*. § 29-60(a)(2).

6

30.     If a prospective tour guide passes the temporary tour-guide exam, a sponsoring employer must file a script with the City so it can be "approved for accuracy" by the government. *Id.* § 29-60(e).

## CHARLESTON'S REGULATIONS BURDEN PLAINTIFFS' SPEECH

### Kimberly Billups

31.     Plaintiff Kimberly Billups spent much of 2015 trying to turn her passion for history into a thriving business. She chose to go into business for herself as a tour guide because she loves teaching others about history and always wanted to start her own business. The only remaining obstacle to Kimberly's opening her business is the City's licensing regime.

32.     Kimberly is not licensed as a tour guide by the City and thus cannot legally give a tour within the geographic boundaries of the City of Charleston.

33.     Kimberly seeks to offer walking history tours of Charleston under the business name "Charleston Belle Tours." Her tours would primarily focus on telling stories about the history of Charleston. As her business grows, Kimberly plans to offer her customers theme-based tours that consist of stories about the history of women in Charleston and of the African-American experience.

34.     Over the past six months, Kimberly took several steps to get her business up and running. She conducted research; designed and printed business cards; set up a credit-card processing account; practiced her storytelling skills; and purchased a historic-styled antebellum dress for her in-character tours of Charleston.

35.     During her research, Kimberly learned that Charleston prohibits tour guides from speaking unless they obtain a government license. She also learned that the City's tour-guide license requires the passage of a 200-question written exam and an oral exam.

7

36. Kimberly registered for the City's November 2015 tour-guide-licensing exam and paid the required $50 fee. She also purchased Charleston's 490-page Tour Guide Training Manual from the City's Tourism Management Office.

37. Kimberly spent five to six hours per day for over two months studying for the City's tour-guide-licensing exam. She read every topic in the manual, reviewed practice questions online, and also worked on reciting the material in the handbook with her husband.

38. On November 9, 2015, Kimberly took the City's 200-question written exam. Despite all of her studying and preparation, Kimberly scored a 70 percent and failed to qualify for the mandatory oral exam or a tour-guide license.

39. Because Kimberly did not score an 80 percent or higher on the City's 200-question written exam, she is prohibited from working as a tour guide in Charleston and barred from opening Charleston Belle Tours.

40. Were it not for the City's licensing requirements, Charleston Belle Tours would be open for business within a day or two.

41. Were it not for the City's licensing regime, Kimberly would lead tours in Charleston for paying customers, grow her business, and hire at least one tour guide.

42. After being barred from opening her own tour-guide business and working as a tour guide herself, Kimberly reviewed the requirements for the City's temporary tour-guide license. She was unable to find a sponsoring employer and is not currently working. Kimberly is also unwilling to restrict the stories she tells individuals to a script approved by the City's Tourism Management Office.

43. The City is prohibiting Kimberly from speaking and telling stories as a tour guide in Charleston because she has not been issued a government license allowing her to do so.

## Michael Warfield

44. Plaintiff Michael Warfield began cultivating his interest in history while growing up in Long Island, New York, during the 1970s. As an adult, he nurtured his passion for colonial history while living in Saratoga Springs, New York, and, since moving to Charleston in 2010, continues to do so to this day.

45. When Michael is not working his day job as an insurance broker, he spends time as an unpaid volunteer at a historical landmark and museum in Charleston's historic district. As a volunteer, Michael spends time telling stories about the building's history and speaking with visitors.

46. The museum's exhibits focus on South Carolina's colonial military history. Volunteering at the museum gives Michael an opportunity not only to learn more about Charleston's history but also to meet others who share his passion for America's colonial history.

47. Michael is not licensed as a tour guide by the City and thus cannot legally give a tour within the geographic boundaries of the City of Charleston.

48. In early 2015, Michael was offered a job as a tour guide whose tours would consist of telling ghost stories and also providing pub tours in Charleston's historic district. Michael determined that this was a great opportunity to supplement his income working in the evenings and immediately began researching the next steps.

49. Michael soon learned about the City's tour-guide-licensing regime. He also discovered that the City requires the passage of a 200-question written exam and an oral exam before one can even qualify for a tour-guide license.

50.     Michael registered for the City's August 2015 tour-guide examination and paid the required $50 fee. He also borrowed a copy of the Charleston Tour Guide Training Manual and began studying the 490-page book.

51.     Michael used many of the same study techniques in preparation for the City's tour-guide-licensing examinations as he did when he studied for, and passed, the Series 7 examination administered by the Financial Industry Regulatory Authority. He studied the manual for weeks, reviewed all the topics, and wrote out historical facts and figures on a board near his desk.

52.     Michael took the City's 200-question written exam on August 24, 2015.

53.     Despite all of his studying and preparation, Michael scored a 73 percent and failed to qualify for the required oral exam or for a tour-guide license.

54.     Michael contacted the City's Tourism Management Office following the August 2015 written exam and asked them what he needed to focus on in order to pass the City's November 2015 written examination. He was told to study all the material contained in the Charleston Tour Guide Training Manual.

55.     Following the August 2015 exam, Michael continued studying the manual for over two months. On November 9, 2015, he again took the City's 200-question written exam. Michael scored a 67 percent on this second attempt. He again failed to qualify for the required oral exam or for a tour-guide license.

56.     The August 2015 and November 2015 written exams contained no questions concerning ghosts or pubs, the very subject matter that Michael would discuss on his tours.

57.     Were it not for the City's licensing regime, Michael would immediately accept an existing job offer as a tour guide in Charleston and begin leading tours for paying customers.

58. In total, Michael invested countless hours over a six-month period studying for the City's tour-guide-licensing examinations. Michael would have spent that time working as a tour guide and telling stories to paying customers were it not for the City's licensing regime.

59. The City is prohibiting Michael from speaking and telling stories as a tour guide in Charleston because he has not been issued a government license allowing him to do so.

### Michael Nolan

60. Plaintiff Michael Nolan recently retired and moved to Charleston with his wife in July 2015. He spent most of his career working as an editor in book publishing. Michael now seeks to work as a tour guide in Charleston in order to supplement his retirement income.

61. Michael enjoys storytelling. His many years of helping authors tell their stories, along with his interest in staying physically fit by walking through the city he now calls home, foster his will to work as a tour guide and tell stories about Charleston.

62. Michael is not licensed as a tour guide by the City and thus cannot legally give a tour within the geographic boundaries of the City of Charleston.

63. The tours Michael seeks to lead focus primarily on the history of Charleston, but they also touch on other subject areas such as the African-American experience in South Carolina.

64. Michael has explored the development of a camera-filming tour concept that would involve leading historical walking tours for individuals intending to take video footage of their tour.

65. Michael soon learned about the City's licensing regime when researching the requirements for working as a tour guide. He also discovered that the City requires the passage of a 200-question written exam and an oral exam before one can qualify for a tour-guide license.

11

66. Michael registered for the November 2015 tour-guide-licensing exams and paid the required $50 fee. He also paid $45 plus tax to purchase the 490-page Charleston Tour Guide Training Manual from the City's Tourism Management Office.

67. Michael spent six weeks studying for the City's licensing exams. He studied the material in the manual and also created flash cards using a smartphone app to practice questions. Michael even rode his bicycle past numerous historic buildings listed in the Charleston Tour Guide Training Manual and took photographs of them to make sure he could match particular facts with specific buildings.

68. On November 9, 2015, Michael took the 200-question written exam. Despite all of his studying and preparation, Michael scored a 64 percent and failed to qualify for the required oral exam or a tour-guide license.

69. Were it not for the City's licensing requirement, Michael would be working as a tour guide in Charleston and leading tours for paying customers.

70. The City prohibits Michael from speaking and telling stories as a tour guide in Charleston because he has not been issued a license allowing him to do so.

## INJURY TO PLAINTIFFS

71. The City's licensing regime threatens Plaintiffs with fines and imprisonment if they speak to their customers without a license.

72. The City's attempt to restrict the discussion of information about the City's places and points of interest is causing and will continue to cause ongoing and irreparable harm to Plaintiffs.

73. But for the City's licensing regime, Plaintiffs Kimberly Billups, Michael Warfield, and Michael Nolan would conduct tours of the City. The burdens imposed by the

City's licensing regime have prevented Plaintiffs from leading tours and thus have prevented them from exercising their First Amendment right to speak about the City of Charleston.

74. In order to obtain a license to describe places and points of interest in the City, Plaintiffs would be forced to take and pass a subject-matter written exam and an oral examination. This would require them to devote time to reviewing the Charleston Tour Guide Training Manual—time that could be spent reviewing materials that are actually relevant to the tours that they would lead. Plaintiffs are unwilling to undertake the burden of studying for unnecessary examinations in order to lead tours.

75. Upon obtaining a tour-guide license, Plaintiffs would be required to undertake additional burdens to maintain it. In addition to paying an annual license fee to the City, they would be required to either retake (and pass) the tour-guide-licensing exams every three years after their license expires or participate in at least four City-approved continuing education lectures each year in order to extend the expiration date of their license. Plaintiffs are unwilling to undertake those burdens in order to lead tours.

76. But for the City's licensing regime, Plaintiff Kimberly Billups would open her new business, Charleston Belle Tours. Kimberly's inability to open her tour business and conduct such tours stifles her ability to market her tour business to customers and grow her business by hiring additional tour guides.

77. But for the City's licensing regime, Plaintiff Michael Warfield would accept a job offer and begin leading ghost and pub tours. Michael's inability to accept an employment opportunity as a tour guide prevents him from supplementing his income by leading tours.

78. But for the City's licensing regime, Plaintiff Michael Nolan would seek employment as a tour guide and lead historical walking tours. Michael's inability to seek

13

employment opportunities as a tour guide prevents him from supplementing his retirement income by leading tours.

79. But for the City's licensing regime, Plaintiff Michael Nolan would develop his business idea of leading camera-filming tours. Michael's inability to lead camera-filming tours in Charleston prevents him from developing this tour concept into a viable business.

80. In order to obtain a temporary tour-guide license so that they may describe places and points of interest in the City, Plaintiffs would be forced to find a sponsoring employer, take the City's temporary tour-guide exam, have their sponsoring employer submit a script to the City to be approved for accuracy, and accept a non-renewable license lasting no more than six months. This would require their devoting time to searching for and securing a sponsoring employer and studying the Charleston Tour Guide Training Manual—time that could be spent reviewing materials that are actually relevant to the tours that they would lead or on other productive pursuits. Plaintiffs are unwilling to undertake the burden of finding a sponsoring employer and studying for an unnecessary temporary tour-guide examination in order to lead tours.

81. Without a license, under the City's licensing regime, Plaintiffs Kimberly Billups, Michael Warfield, and Michael Nolan are unable to meaningfully share their opinions, thoughts, and knowledge about Charleston, South Carolina, with individuals who wish to take tours of the City.

## LACK OF FOUNDATION FOR CHARLESTON'S REGULATIONS

82. Any government interests purportedly advanced by the City's licensing regime could be advanced equally effectively by any number of less-restrictive alternatives—including a voluntary, rather than mandatory, tour-guide-certification system.

83. Charleston is one of only approximately five cities in the United States that require tour guides to pass an examination before they may work as guides.

84. Upon information and belief, the City has no evidence of any harm that has ever befallen the public due to a city's failure to require tour guides to pass an examination before they may work as guides.

85. A number of jurisdictions in the United States, including but not limited to Philadelphia, have active voluntary-certification programs for tour guides.

86. These voluntary-certification programs offer would-be guides an opportunity to earn a credential (such as "certified guide") by, for example, passing an examination, but they do not give the local government the authority to punish a guide who chooses to speak without obtaining this credential.

87. Upon information and belief, the City has no evidence that these voluntary-certification programs are in any way less effective than its licensing regime.

88. Upon information and belief, the City possesses no evidence that any interests purportedly advanced by its licensing regime could not be advanced equally well by a voluntary, rather than mandatory, tour-guide-certification system.

89. Upon information and belief, the City possesses no evidence that market forces (including the presence of online review sites such as Yelp and TripAdvisor) are insufficient to protect any government interest that might purportedly be advanced by the City's licensing regime for tour guides.

90. Upon information and belief, the City has no evidence that requiring tour guides to submit an application and pay a licensing fee advances any government interest.

91. Upon information and belief, the City has no evidence of harms that would arise if the requirement to submit an application and pay a licensing fee were removed.

92. Upon information and belief, the City has no evidence that its written exam advances any government interest.

93. Upon information and belief, the City has no evidence of harms that would arise if the requirement to pass a written exam were removed.

94. Upon information and belief, the City has no evidence that its oral exam advances any government interest.

95. Upon information and belief, the City has no evidence of harms that would arise if the requirement to pass an oral exam were removed.

96. Upon information and belief, the City has no evidence that its temporary tour-guide exam advances any government interest.

97. Upon information and belief, the City has no evidence of harms that would arise if the requirement to pass a temporary tour-guide exam were removed.

98. Upon information and belief, the City has no evidence that requiring guides to work for a sponsoring employer as temporary tour guides advances any government interest.

99. Upon information and belief, the City has no evidence of harms that would arise if the requirement that guides work for sponsoring employers as temporary tour guides were removed.

100. Upon information and belief, the City has no evidence that requiring government approval of a script as a condition for a temporary license advances any government interest.

101. Upon information and belief, the City has no evidence of harms that would arise if the requirement for government approval of a script as a condition for a temporary license were removed.

102. Upon information and belief, the City has no evidence of any government interest that is served by requiring guides to take a written exam before they can lead ghost tours.

## COUNT I:
## FIRST AMENDMENT CHALLENGE TO
## CHARLESTON'S LICENSING REGIME

103. Plaintiffs re-allege and incorporate by reference each and every allegation set forth in ¶ 1 through ¶102 of this Complaint as if fully set forth herein.

104. The First Amendment to the U.S. Constitution protects the right to earn a living by speaking on topics of one's choice without first obtaining a special license from the government.

105. Charleston's mandatory tour-guide-licensing regime—described above and codified at Charleston City Code §§ 29-58 to -63 and § 29-66, together with the definitions of "registered tour guide" and "temporary tour guide" contained in § 29-2—violates Plaintiffs' rights to free speech as guaranteed by the First Amendment to the U.S. Constitution.

106. Unless Defendant is enjoined from enforcing that regime, Plaintiffs will suffer continuing and irreparable harm.

## REQUEST FOR RELIEF

Therefore, Plaintiffs respectfully request the following relief:

A. A declaratory judgment by the Court that, facially and as applied to Plaintiffs, the tour-guide-licensing regime codified at Charleston City Code §§ 29-58 to -63 and § 29-66, together with the definitions of "registered tour guide" and "temporary tour guide" contained in § 29-2, violates the First Amendment to the U.S. Constitution;

B.  Permanent injunctive relief prohibiting Defendant or its agents from enforcing the tour-guide-licensing regime codified at Charleston City Code §§ 29-58 to 29-63 and § 29-66, together with the definitions of "registered tour guide" and "temporary tour guide" contained in § 29-2;

C.  An award of attorneys' fees, costs, and expenses in this action;

D.  An award of nominal damages in the amount of $1 to each Plaintiff; and

E.  Any other legal or equitable relief to which Plaintiffs may show themselves to be justly entitled.

Dated this 28th day of January, 2016.

Respectfully submitted,

**/s/ Sean A. O'Connor**

| | |
|---|---|
| Arif Panju* (TX Bar No. 24070380) | Sean A. O'Connor (District Court ID No. 7601) |
| INSTITUTE FOR JUSTICE | FINKEL LAW FIRM LLC |
| 816 Congress Avenue, Suite 960 | 4000 Faber Place Drive, Suite 450 |
| Austin, TX 78701 | North Charleston, SC 29405 |
| Tel: (512) 480-5936 | Tel: (843) 576-6304 |
| Fax: (512) 480-5937 | Fax: (866) 800-7954 |
| Email: apanju@ij.org | Email: soconnor@finkellaw.com |

Robert J. McNamara* (VA Bar No. 73208)
INSTITUTE FOR JUSTICE            *Local Counsel for Plaintiffs*
901 North Glebe Road, Suite 900
Arlington, VA 22203
Tel: (703) 682-9320
Fax: (703) 682-9321
Email: rmcnamara@ij.org

*Attorneys for Plaintiffs*
* Pro Hac Vice Applications to be Filed