**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | |
|---|---|
| KIMBERLY BILLUPS, MICHAEL WARFIELD, and MICHAEL NOLAN, )<br><br>Plaintiffs, )<br><br>vs. )<br><br>CITY OF CHARLESTON, SOUTH CAROLINA, )<br><br>Defendant. ) | Civil No. 2:16-cv-00264-DCN<br><br>**ORDER** |

This matter is before the court on plaintiffs Kimberly Billups, Michael Warfield, and Michael Nolan's (collectively, "plaintiffs") motion for preliminary injunction, and defendant City of Charleston's (the "City") motion to dismiss. For the following reasons, the court denies plaintiffs' motion for preliminary injunction and denies the City's motion to dismiss.

## I.  BACKGROUND

This dispute arises out of a First Amendment challenge to the City's regulation of tour guides. The city of Charleston, South Carolina draws millions of visitors every year and has developed a reputation for being one of the top tourist destinations in the world. Riley Aff. ¶ 3. Given the size and significance of the local tourism industry, the City has long regulated the industry in a number of ways. Id. ¶¶ 4–5. Pursuant to Charleston City Code § 29-58, the City prohibits any person from "act[ing] or offer[ing] to act as a tour guide in the city for hire unless he or she has first passed a written examination and is licensed by the [City]." A "tour guide" is defined as a "person who acts or offers to act as a guide for hire through any part of"

certain regulated areas of the city.  Charleston City Code § 29-2.  The City defines a "tour or touring" as "the conducting of or the participation in sightseeing . . . for hire or in combination with a request for donations."  Id.

The City recently amended the prerequisites to obtaining a tour guide license. ECF No. 26, Def.'s Second Supp. 1.  As the regulations currently stand, the City simply requires prospective tour guides to pass the aforementioned written examination and obtain a valid business license before qualifying for a tour guide license.  Id.  The written examination is designed to "test the applicant's knowledge of the city and its history," Charleston City Code § 29-59((b), and consists of 200 questions drawn from information provided in the Charleston Tour Guide Training Manual (the "Manual"), a 490-page study guide sold by the City's Tourism Management Office.  Compl. ¶¶ 16, 20.  The stated purpose of the Manual "is to provide a wealth of knowledge for prospective and current licensed tour guides" in an effort to further "the city's goal to provide accurate, factual and updated information to its visitors and residents."  Id. ¶ 21; ECF No. 5-3, Manual Excerpts.  A prospective tour guide must correctly answer 70 percent of the exam questions to pass.[1] Charleston City Code § 29-59(f).  Once licensed, tour guides are required to attend four continuing education lectures every three years in order to extend the term of

---

[1]    Prior to the recent amendments, prospective tour guides were required to correctly answer 80 percent of the exam questions to pass.  Compl. ¶ 17.  The recent amendments make the reduced 70 percent threshold retroactive to April 26, 2015.  ECF No. 26-1, Ordinance §10.

their license.  Charleston City Code § 29-63.  Otherwise, the license will lapse, and the tour guide will be required to retake the written examination.[2]  Id.

Prior to the recent amendments, the City also required prospective tour guides to pass an oral examination, wherein candidates would "act as a guide" before City officials and be evaluated on a "pass or fail basis."  Compl. ¶ 18; see also Ordinance § 3 (striking provisions requiring oral examination).  Beyond "acting as a tour guide," the pre-amendment Code recognized two additional roles an individual might occupy in a guided tour operation:  a "temporary tour guide" and an "escort."  Compl. ¶¶ 27–30; see also Ordinance §§ 1, 2, 4, 5, 7–9 (striking provisions dealing with temporary tour guides and removing reference to tour "escorts").  Under certain conditions, individuals could obtain a one-time, temporary tour guide license that lasted for a maximum of six months.  Compl. ¶ 27.  To obtain such a license, applicants needed to pass a "temporary tour guide examination" and be "sponsored and employed by persons who operate a licensed tour company."  Id. ¶¶ 28, 29.  The sponsoring employer was also required to file a script with the City which the City would "approve for accuracy."  Id. ¶ 30.

Tour "escorts" were persons employed to satisfy certain size restrictions on walking tour groups.  The City requires group walking tours conducted in the public right of way for groups of over 20 persons to be divided into sub-groups of no more than 20 people.  Ordinance § 9 (amending limits on size requirements of Charleston City Code § 29–261).  The pre-amendment regulations required an "escort," who did not need to be a licensed tour guide, to accompany any sub-groups that were not

---

[2]    After maintaining a valid license for a period of 25 years, a tour guide obtains the status of "tour guide emeritus" and is relieved of any continuing education or testing requirements.  Charleston City Code § 29-63.

accompanied by a licensed tour guide.  Id.  Now, the City requires that each sub-group "be accompanied by a licensed tour guide."  Id.

Plaintiffs are individuals who wish to work as tour guides in Charleston, but failed to meet the 80 percent threshold required to pass the written licensing exam when they each took it in 2015.  Compl. ¶¶ 38, 52–55, 68.  Notably, plaintiffs Kimberly Billups and Michael Warfield each scored over the current 70 percent threshold in November 2015 and August 2015, respectively.  Id. ¶ 38, 53.  Pursuant to the retroactive application of the new 70 percent threshold, Billups and Warfield are now eligible to obtain tour guide licenses.  See Ordinance § 10.  Plaintiff Michael Nolan, however, remains ineligible for a tour guide license and must still pass the written examination.  Compl. ¶ 68 (noting that plaintiff Nolan scored a 64 percent on his only attempt to pass the written exam).  Billups and Warfield remain subject to the continuing education requirements and the prospect of future examination if they fail to meet those requirements.  Charleston City Code §29-63.

On January 28, 2016, plaintiffs filed a complaint alleging that the City's tour guide license requirement violated the First Amendment of the United States Constitution, both facially and as applied to them.  Compl. ¶¶ 103–06.  On February 2, 2016, plaintiffs filed a motion for preliminary injunctive relief prohibiting the City and its agents from enforcing the tour guide licensing requirement and the related provisions of the Charleston City Code.  On March 7, 2016, the City filed a response to plaintiffs' motion for a preliminary injunction, as well as a motion to dismiss.  On March 14, 2016, plaintiffs filed a reply in support of their motion for preliminary injunction, and on March 24, 2016, plaintiffs filed a response to the City's motion to

dismiss.  On April 4, 2016, the City filed a reply in support of its own motion to

dismiss.  Shortly thereafter, the City began the process of approving the above-

described amendments to the Charleston City Code.  On April 15, 2016, the parties

each submitted supplemental briefing to address the impact these changes have on the

pending motions.  The court heard arguments on April 19, 2016, and the amended

Code provisions went into effect on April 26, 2016.[3]  The motions are now ripe for

the court's review.

## II.  STANDARD

### A.    Motion to Dismiss

Under Federal Rule of Civil Procedure 12(b)(6), a party may move to dismiss

for "failure to state a claim upon which relief can be granted."  When considering a

Rule 12(b)(6) motion to dismiss, the court must accept the plaintiff's factual

allegations as true and draw all reasonable inferences in the plaintiff's favor.  See E.I.

du Pont de Nemours & Co. v. Kolon Indus., 637 F.3d 435, 440 (4th Cir. 2011).  But

"the tenet that a court must accept as true all of the allegations contained in a

complaint is inapplicable to legal conclusions."  Ashcroft v. Iqbal, 556 U.S. 662, 678

(2009).  On a motion to dismiss, the court's task is limited to determining whether the

complaint states a "plausible claim for relief."  Id. at 679.  Although Rule 8(a)(2)

requires only a "short and plain statement of the claim showing that the pleader is

entitled to relief," "a formulaic recitation of the elements of a cause of action will not

do."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).  The "complaint must

contain sufficient factual matter, accepted as true, to 'state a claim to relief that is

---

[3]    Charleston City Code § 29-59(f), which reduced the passing threshold to 70 percent, was made retroactive to April 26, 2015, as described above.

plausible on its face.'"  Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 570).

"Facts pled that are 'merely consistent with' liability are not sufficient."  A Soc'y

Without a Name v. Va., 655 F.3d 342, 346 (4th Cir. 2011) (quoting Iqbal, 556 U.S. at

678).

**B.       Motion for Preliminary Injunction**

Federal Rule of Civil Procedure 65(a) grants discretion to the reviewing court

in deciding whether to issue a preliminary injunction.  It provides that a court "may

issue" a preliminary injunction only upon notice to the adverse party.  Fed. R. Civ. P.

65(a).  A preliminary injunction is "an extraordinary remedy that may only be

awarded upon a clear showing that the plaintiff is entitled to such relief."  Winter v.

Natural Res. Def Council Inc., 555 U.S. 7, 22 (2008); see Munaf v. Geren, 553 U.S.

674, 689–90 (2008) (internal citation and quotation marks omitted) ("A preliminary

injunction is an extraordinary and drastic remedy; it is never awarded as of right."); In

re Microsoft Corp. Antitrust Litig., 333 F.3d 517, 526 (4th Cir. 2003) ("[P]reliminary

injunctions are extraordinary interlocutory remedies that are granted in limited

circumstances and then only sparingly."), abrogated on other grounds by eBay, Inc. v.

MercExchange, LLC, 547 U.S. 388 (2006).  A party seeking a preliminary injunction

must demonstrate that:  (1) it is likely to succeed on the merits, (2) it is likely to suffer

irreparable harm, (3) the balance of hardships tips in its favor, and (4) the injunction

is in the public interest.  Metro. Reg'l Info. Sys. v. Am. Home Realty Network, Inc.,

722 F.3d 591, 595 (4th Cir. 2013) (citing Winter, 555 U.S. at 20).  "To obtain a

preliminary injunction under the Winter test, a movant must make a 'clear showing'

of [the] four requirements." <u>Alkebulanyahh v. Nettles</u>, No. 10-cv-2976, 2011 WL 2728453, at *3 (D.S.C. July 13, 2011).

Preliminary injunctions may be categorized as either prohibitory or mandatory. <u>Pashby v. Delia</u>, 709 F.3d 307, 320 (4th Cir. 2013). "[A] preliminary injunction's tendency to preserve the status quo determines whether it is prohibitory or mandatory." <u>Id.</u> Whereas "prohibitory injunctions aim to maintain the status quo," <u>id.</u> at 319, "[m]andatory preliminary injunctions generally do not [] and normally should be granted only in those circumstances when the exigencies of the situation demand such relief." <u>East Tenn. Nat. Gas Co. v. Sage</u>, 361 F.3d 808, 828 (4th Cir. 2004) (quoting <u>Wetzel v. Edwards</u>, 635 F.2d 283, 286 (4th Cir. 1980)); <u>Vollette v. Watson</u>, 2012 WL 3026360, at *3 (E.D. Va. July 24, 2012) ("The [standard outlined in <u>Winter</u>] becomes even more exacting when a plaintiff seeks a preliminary injunction <u>that mandates action</u>, as contrasted with the typical form of preliminary injunction that merely preserves the status quo pending trial.") (emphasis in original). Therefore, when faced with a request for a mandatory preliminary injunction "courts apply the exacting preliminary injunction standard in an 'even more searching' manner than for the more common prohibitory preliminary injunctions." <u>Wellin v. Wellin</u>, No. 2:13-cv-1831-DCN, 2013 WL 6175829, at *3 (D.S.C. Nov. 22, 2013) (quoting <u>Pashby</u>, 709 F.3d at 319). In determining the nature of a preliminary injunction, the Fourth Circuit defines the "status quo" as the "last uncontested status between the parties which preceded the controversy." <u>Pashby</u>, 709 F.3d at 320 (quoting <u>Aggarao v. MOL Ship Mgmt. Co.</u>, 675 F.3d 355, 378 (4th Cir. 2012)).

### III.   DISCUSSION

Plaintiffs argue they are entitled to a preliminary injunction restraining the City from enforcing its tour guide licensing regulations because such regulations are clearly unconstitutional and are currently preventing plaintiffs' from exercising their First Amendment rights.  Plaintiffs are obviously asking for a mandatory preliminary injunction.  The City argues that the plaintiffs' claims should be dismissed because the challenged regulations do not regulate or impermissibly burden speech within the meaning of the First Amendment.

Though different standards apply to each motion, the first factor of the preliminary injunction inquiry under Winter presents the same basic question as the City's motion to dismiss—whether the City's licensing regime violates the First Amendment.  Indeed, plaintiffs' arguments as to the other Winter factors rely on the assumption that the licensing regime is unconstitutional.  See Pls.' Mot. 22–23 (arguing that plaintiffs' showing of irreparable harm is "inseparably linked" to their showing of a violation of their First Amendment rights (citing Newsom ex rel. Newsom v. Albemarle Cty. Sch. Bd., 354 F.3d 249, 261 (4th Cir. 2003))); Id. at 23–24 (arguing that harms imposed by the possibility of sanctions and the restriction of plaintiffs' speech outweigh the City's interest in enforcing an unconstitutional law); Id. at 24 (arguing that curtailing constitutionally protected speech cannot advance the public interest).  Therefore, the court will address the central question of the licensing regime's constitutionality at the outset.  This discussion will be sufficient to fully decide the City's motion to dismiss and will effectively determine the outcome of plaintiffs' motion for preliminary injunction.

8

**A.    Motion to Dismiss and Likelihood of Success on the Merits**

**1.    The First Amendment Applies**

"The First Amendment, applicable to the States through the Fourteenth Amendment, prohibits the enactment of laws 'abridging the freedom of speech.'" Reed v. Town of Gilbert, Ariz., 135 S. Ct. 2218, 2226 (2015) (quoting U.S. Const., Amdt. 1).  First Amendment protection may extend to the regulation of conduct where the "conduct triggering coverage under the [regulation] consists of communicating a message." Holder v. Humanitarian Law Project, 561 U.S. 1, 28 (2010).

The City argues that the licensing regime only regulates the act of charging money for tour guide services, and that such action does not implicate the First Amendment.  Def.'s Resp. 13–14; Def.'s Mot. 8–9.  To support this proposition, the City relies on Detroit Automotive Purchasing Services, Inc. v. Lee, a 1978 decision from the District of Maryland in which the court found that a state law requiring a license to "make[] arrangements on behalf of clients to purchase particular vehicles" did not implicate the First Amendment.  463 F. Supp. 954, 972 (D. Md. 1978).  The Detroit Automotive court noted that the plaintiffs, who operated an automobile purchasing service, remained free to provide customers with information on the price of new automobiles.  Id.  The City contends that the plaintiffs in this case are similarly free to engage in tour guide services, so long as they do not charge for them. Def.'s Mot. 9.

The City's focus on the "conduct" constituting the transaction loses sight of the expressive material being distributed through that transaction.  The content of the

9

transaction is what distinguishes the City's licensing regime from the licensing statute

at issue in Detroit Automotive.  In Detroit Automotive, the court viewed the license

requirement as a prohibition on selling vehicles, Detroit Automotive, 463 F. Supp. at

972, whereas here, the City's regulations restrict the sale of a service—acting as a

tour guide.[4]  Because tour guide services frequently involve telling stories or

providing other information about the various sites on the tour, there is no question

that such services often act as vessels for the distribution of speech.[5]  In this way, the

sale of tour guide services is less like the sale of vehicles and more like the sale of

marketing information or message-bearing shirts, both of which have been subjected

to First Amendment scrutiny.  See Sorrell v. IMS Health Inc., 131 S. Ct. 2653, 2667

(2011) (finding that "sale, transfer, and use of prescriber-identifying information"

used by pharmaceutical manufacturers to market their products constituted "speech

within the meaning of the First Amendment"); One World One Family Now v. City

& Cty. of Honolulu, 76 F.3d 1009, 1012 (9th Cir. 1996) (recognizing that sale of

message-bearing shirts "fall[s] within the ambit of the First Amendment").  Even if it

is possible to provide tour guide services without disseminating speech, the Supreme

Court has recognized that where an activity does not invariably take the form of

speech, First Amendment scrutiny must still be applied to the portion of such conduct

---

[4]    The City effectively concedes that tour guide services implicate speech through its repeated emphasis of the fact that unlicensed individuals are free to engage in the sorts of acts that constitute "tour guide services" as long as they do not charge a fee.  Def.'s Resp. 14. Def.'s Mot. 3.

[5]    At this point in the analysis, the court simply addresses the City's contention that no First Amendment scrutiny is required at all.  This leaves to the side the secondary question of whether tour guide services constitute a content-specific form of speech.  Because the court finds that tour guide services do constitute, or at least implicate, "speech" within the meaning of the First Amendment, it will be necessary to take up this secondary question to determine what sort of First Amendment scrutiny must be applied.

that does implicate speech.  See Holder, 561 U.S. at 26 (recognizing that the prohibited conduct "most often does not take the form of speech," but nevertheless finding that "conduct" was not the only activity at issue and applying First Amendment scrutiny to the portion of the statute which regulated speech); see also United States v. O'Brien, 391 U.S. 367, 376 (1968) (requiring First Amendment scrutiny where "'speech' and 'nonspeech' elements are combined in the same course of conduct").

Thus, the fact that the plaintiffs in Detroit Automotive did not need a license to inform customers about the price of automobiles is not analogous to the instant plaintiffs' ability to engage in free tour guide services.  Communicating the price of an automobile simply facilitates the sale of the automobile.  The automobile remains the object of the sale.  In this case, tour guide services are not ancillary communications used to facilitate a transaction; they are—like the automobiles in Detroit Automotive—the objects of the transaction.  Thus, the appropriate comparison is between tour guide services and automobiles, not communications about the price of automobiles.[6]  Regulating the sale of automobiles certainly burdens the distribution of automobiles, and the City's licensing regime places an analogous burden on the distribution of tour guide services.  The crucial difference is: automobiles do not convey messages, while tour guide services do.  Therefore, it is clear that the regulation of tour guide services implicates speech, and some form of First Amendment scrutiny is necessary.[7]

---

[6]     Whether or not plaintiffs are free to communicate the price of tour guide services is not the issue in this case.

[7]     Even the Fifth Circuit in Kagan v. City of New Orleans, which found that a similar tour guide licensing regime in New Orleans was constitutional, applied some First

## 2.     Appropriate First Amendment Scrutiny

The question then arises:  what form of First Amendment scrutiny is required?  The answer turns on the manner in which the City's licensing regime threatens the aims of the First Amendment.

The animating purpose behind the First Amendment "lies [in] the principle that each person should decide for himself or herself the ideas and beliefs deserving of expression, consideration, and adherence."  Turner Broad. Sys., Inc. v. F.C.C., 512 U.S. 622, 641 (1994).  Thus, "a government, including a municipal government vested with state authority, 'has no power to restrict expression because of its message, its ideas, its subject matter, or its content.'"  Reed, 135 S. Ct. at 2226 (quoting Police Dept. of Chicago v. Mosley, 408 U.S. 92, 95 (1972)).  "Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests."  Id.  "In contrast, [laws] that are unrelated to the content of speech are subject to an intermediate level of scrutiny, [] because in most cases they pose a less substantial risk of excising certain ideas or viewpoints from the public dialogue."  Turner Broad. Sys., 512 U.S. at 642 (citing Clark v. Community for Creative Non–Violence, 468 U.S. 288, 293 (1984)).

A law may be content-based in two ways:  it may be content-based "on its face," or it may rely on a content-based "purpose and justification."  Reed, 135 S. Ct.

_____

Amendment scrutiny.  753 F.3d 560, 562 (5th Cir. 2014), cert. denied, 135 S. Ct. 1403 (2015).  Though the opinion is quite brief, the Kagan court analyzed the licensing requirement under "intermediate scrutiny" consistent with the Supreme Court's decision in Ward v. Rock Against Racism, 491 U.S. 781 (1989).  Id.

at 2228. Plaintiffs first argue that the licensing requirement is content-based on its face because it singles out a particular form of speech—speech given during tours. Pls.' Mot. 11; Pls.' Resp. 6–7; Pls.' Supp. Resp. 5–6. The City contests this assertion by highlighting the fact its regulations place no limitation on the message tour guides convey. Def.'s Resp. 16. The parties' arguments thus rely on very different understandings of what constitutes "content" under the First Amendment. While the City assumes that "content" refers to the specific viewpoint being conveyed, plaintiffs rely on a broader understanding of the concept that embraces not just the viewpoint expressed, but the form or function of the burdened speech. Plaintiffs clearly understand "tour guide services" to entail a distinct form of speech, worthy of protection in its own right, and argue that the City's regulations draw a distinction based on the speech required to perform such services.[8] Pls.' Mot. 11; Pls.' Resp. 6–7; Pls.' Supp. Resp. 5–6.

The Supreme Court has explained that while "[s]ome facial distinctions based on a message are obvious, . . . others are more subtle, [such as] defining regulated speech by its function or purpose." <u>Reed</u>, 135 S. Ct. at 2227. It could certainly be argued that tour guide services necessarily entail a particular type of speech that is defined by its "function or purpose," rather than the specific ideas conveyed. <u>Id.</u> The Supreme Court regards "marketing" as such a category, and has applied strict scrutiny

---

[8] Plaintiffs' initial motion for preliminary injunction and response to the City's motion to dismiss pointed to the role of a tour "escort" under the City's pre-amendment regulations to illustration this distinction. Pls.' Mot. 11; Pls.' Resp. 6–7. Plaintiffs argued that an unlicensed tour escort was permitted to engage in all of the same conduct as a licensed tour guide, <u>except</u> that the escort could not talk about points of interest. Pls.' Mot. 11; Pls.' Resp. 6–7. Since the City has recently removed the role of a tour "escort" from the regulations, plaintiffs now transfer this argument to a hypothetical bus driver of a vehicle based tour. Pls.' Supp. Resp. 5–6.

to laws that disfavor such speech.  See Sorrell, 131 S. Ct. at 2663 ("The statute thus disfavors marketing, that is, speech with a particular content.").

In this case, however, this argument is unpersuasive.  The City defines a "tour or touring" as the "conducting of or the participation in sightseeing."  Charleston City Code § 29-2.  This broad definition does not explicitly mention speech at all, and the court is unable to discern what form or function of speech would be necessarily required to perform such activities.  Whereas the "marketing speech" can be defined as speech "used to influence sales or the market share of a [product]," see Sorrell, 564 U.S. at 559,[9] it is very difficult to functionally define the speech required to perform "tour guide services" or "act[] as a guide" without circularly referring to speech made in the course of such conduct.  Though plaintiffs seem to define "tour guide speech" as speech related to the various points of interest along a given tour route, Pls.' Mot. 11, plaintiffs themselves recognize that many different activities fit within the definition of a "tour."  Id. at 19–20 (arguing that no nexus exists between the City's written examination and a particular guide's speech, because guides may give tours about history, legends, or ghosts).  Little imagination is required to see that, depending on the particular nature of a given "tour," any speech could be considered a part of "acting as a guide."  See Charleston City Code § 29-2.

For instance, one might imagine a tour that simply takes visitors along a scenic route, without discussing particular points of interest—perhaps a silent tour for

_____

[9]     At least, this was the definition of marketing at issue when the question was addressed by the Supreme Court in Sorrell.

the particularly contemplative, or a running tour for exercise enthusiasts.[10]  In either scenario, the basic value of the experience would be either the route itself or the mode of travel, and the various directions the guide gave would necessarily be considered part of the "tour guide services," since the guide would be offering little else.  On the opposite extreme, one might offer tours in character as a historical figure.[11]  In this hypothetical, the entertainment value of the guide's performance would clearly be an important component of the "tour guide services" being offered.  As such, every word uttered by the guide—from directions, to stories, to basic conversation—could be considered part of "acting as a guide."  Thus, "tour guide speech" is not confined to any particular form or function.

       The most that can be said is that acting as a tour guide requires one to speak with the function or purpose of acting as a tour guide.  Whatever the Court intended when it held that a law may be content-based if it facially distinguishes between categories of speech defined by their "function or purpose," Reed, 135 S. Ct. at 2227, it cannot have meant that every law restricting conduct also imposes a content-based restriction on speech made in the course of such conduct.  This rationale would effectively remove the distinction between speech and conduct, and require almost every regulation to pass strict scrutiny under the First Amendment.  The court finds this result untenable.  See O'Brien, 391 U.S. at 376 ("We cannot accept the view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea.").  The more

---

[10]       Even if one regards these hypotheticals as somewhat implausible, they nevertheless fall within the definition of a "tour" set forth in Charleston City Code § 29-2, as both could be said to involve "the conducting of or the participation in sightseeing."

[11]       Indeed, this hypothetical is not far from the tours plaintiff Kimberly Billups actually plans to offer.  Compl. ¶ 34.

persuasive view is that speech required to "act as a guide" can only be sensibly

defined at a level of abstraction beyond "function or purpose," such that it could

entail many different "functions or purposes," just as it could entail many specific

viewpoints.  Therefore, the court finds that the City's licensing regime is not content-

based on its face.

Even if a regulation is not content-based on its face, it may nevertheless be

content-based if it was imposed with a content-based purpose or justification.  Sorrell,

131 S. Ct. at 2664 ("Even if the hypothetical measure on its face appeared neutral as

to content and speaker, its purpose to suppress speech and its unjustified burdens on

expression would render it unconstitutional").  In making this assessment the court

may consider formal legislative findings, the statute's stated purposes, as well as the

"inevitable effect" of the statute.  Id.

Plaintiffs argue that the City's license requirement is motivated by an intent to

influence the content of the tour guides' speech.  Pls.' Mot. 12–14; Pls.' Resp. 7; Pls.'

Supp. Resp. 3–5.  Plaintiffs highlight language in the Manual stating that the "honor"

of acting as a tour guide is reserved for "a special few who . . . have mastered

[Charleston's] most telling stories," and that the "[C]ity's goal [is] to provide

accurate, factual and updated information to its visitors and residents."  Manual

Excerpts 3.  Plaintiffs argue that the very nature of the written exam reveals a content

preference, because the exam focuses on specific content—namely, the city and its

history.  Id. at 13.  Plaintiffs also argue that two recently repealed components of the

licensing regime—the oral examination and script approval for temporary licenses—

reveal a statutory intent to influence the content of a tour guide's speech because both required the City to evaluate such speech before it was given.  Pls.' Supp. Resp. 3–4.

The City offers a different justification for the licensing requirement, arguing that its purpose is to "protect the City's tourism economy and its residents and visitors from false or misleading offers of service for compensation."  Def.'s Resp. 21; Def.'s Mot. 13.  This assertion finds support in the language of Charleston City Code § 29-1, which states that the purpose of the Code sections regulating tourism is "to maintain, protect and promote the tourism industry and economy of the city . . . ."  The City contends that the licensing requirement accomplishes this goal by ensuring that all persons holding themselves out as tour guides have a "base level of competency to provide the touring services they are charging for."  Def.'s Resp. 7.

### a.     Motion to Dismiss

It is clear that, for motion to dismiss purposes, plaintiffs have sufficiently stated a claim that the tour guide licensing regime relies on a content-based justification, and therefore, must be evaluated under strict scrutiny.  Though the City has offered its own competing justifications, it has not demonstrated that plaintiffs' allegations are insufficient to support their claim, especially when such allegations are construed in plaintiffs' favor.  Moreover, the City's justifications are not necessarily inconsistent with plaintiffs' argument.  Even if one accepts that the City intends to ensure that all tour guides possess a "base level of competency," that intent is entirely consistent with a desire to influence the content of their speech—especially if one assumes that the City regards a "competent" tour guide to be one who provides visitors with certain types of information.  Given the written examination's focus on

certain topics, it is fair to say that the examination provides some indication that the City holds particular views about what information a "competent" tour guide would convey and that the licensing regime is an attempt to restrict speech that does not convey such information. On this view, the licensing regime is clearly content-based and therefore subject to strict scrutiny.

### b.    Motion for Preliminary Injunction

Turing to plaintiffs' motion for preliminary injunction, the question is much closer. Under the preliminary injunction standard, it is not enough for plaintiffs to simply point to the existence of allegations or evidence supporting their motion; the court must weigh such considerations against the opposing arguments and evidence to determine whether plaintiffs have made a "clear showing" that they are likely to prevail on the merits of their claim. Importantly, the court must apply an even more exacting "clear showing" standard in this case, because plaintiffs seek to alter the regulatory scheme currently in place, thereby disturbing the "status quo." See Pashby, 709 F.3d at 320.

While the City's proffered justification for its licensing requirement may be consistent with an underlying content-based purpose, it does not necessarily establish such a purpose. That is, while content-based preferences could be embedded in the City's desire to ensure that all tour guides possess a "base level of competency," that desire could also be entirely content-neutral. Certainly, a desire to "protect the City's tourism economy and its residents and visitors from false or misleading offers of service for compensation," Def.'s Resp. 21; Def.'s Mot. 13, is not content-based by its own terms. It is entirely possible that the City designed its licensing regime to

18

filter out would-be swindlers by ensuring that individuals providing "tour guide services" actually knew what they were talking about and had some understanding of the topics they discussed. Indeed, the Fifth Circuit found this basic purpose to be sufficiently content-neutral when analyzing New Orleans's tour guide licensing regime in <u>Kagan v. City of New Orleans, La.</u>, 753 F.3d 560 (5th Cir. 2014), <u>cert. denied</u>, 135 S. Ct. 1403 (2015) (finding the city's desire to "identif[y] those tour guides who . . . are reliable, being knowledgeable about the city and trustworthy, law-abiding and free of drug addiction" to be content neutral).[12] Thus, the written examination's focus on certain topics may simply reflect the City's assessment of what topics tour guides in Charleston are likely to address, not the topics the City wants them to address. An attempt to tailor the written examination to the conditions of the tour guide market takes the desires of tourism industry participants as its starting point, and thus, does not evince a content-based desire to influence the types of speech being traded in that market.[13]

As previously mentioned, the language of Charleston City Code § 29-1 supports this understanding of the City's motivations. Charleston City Code § 29-1 ("It is the purpose of such regulation to maintain, protect and promote the tourism industry and economy of the city . . . ."). The fact that the licensing regime permits

---

[12]    Notably, the district court in <u>Edwards v. District of Columbia</u>, 943 F. Supp. 109, 121 (D.D.C. 2013), also found the District of Columbia's tour guide licensing requirement to be content-neutral. Though the D.C. Circuit ultimately reversed the district court's decision, it did not address the district court's finding on this issue. <u>See</u> <u>Edwards v. D.C.</u>, 755 F.3d 996, 1001 (D.C. Cir. 2014) ("[W]e will assume, arguendo, the validity of the District's argument that the regulations are content-neutral and place only incidental burdens on speech.").

[13]    Whether the City's attempt to tailor its examination to the relevant topics was successful may be analyzed under the intermediate scrutiny standard, but the point remains: a poorly designed examination does not preclude the possibility of a content-neutral purpose.

tour guides to speak on whatever topics they wish provides further support for this view.  See Kagan, 753 F.3d at 562 ("[T]he New Orleans law in its requirements for a license has no effect whatsoever on the content of what tour guides say.  Those who have the license can speak as they please . . . .").  As for plaintiffs' argument that the recently repealed oral examination and script approval provisions reveal the City's content-based purposes by virtue of their initial enactment, one cannot simply ignore the City's more recent amendments.  Just as one might consider the passage of such provisions as indicative of an unconstitutional purpose, one might regard their repeal as indicative of a determination that they were unnecessary to the City's legitimate purpose.  This is not to say that plaintiffs' argument is wholly meritless, but rather that it relies on an interpretation of intent that is subject to challenge from competing interpretations.[14]

Given the evidence suggesting a content-neutral purpose, the court finds that plaintiffs have failed to meet their burden to make a "clear showing" that the licensing requirement was implemented for a content-based purpose.  Though plaintiffs have presented their own evidence of a content-based purpose, the court simply finds that this evidence is not convincing enough to establish the requisite "clear showing."  Therefore, the court finds that, for preliminary injunction purposes, plaintiffs have failed to clearly show that the regulations at issue are content-based and it is necessary to evaluate such regulations under intermediate scrutiny.

---

[14]     The court does not mean to suggest that the City may support its regulations with post hoc justifications in response to litigation.  Greater Baltimore Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Baltimore, 721 F.3d 264, 282 (4th Cir. 2013).  The court simply finds that, at this point, the record does not clearly establish that the City's content-neutral justification falls in this category.

### 3.    Intermediate Scrutiny

Now, the court is faced with a fork in the road[15]—on the one hand, the City has failed to meet its burden to show that strict scrutiny should not be applied for motion to dismiss purposes, and on the other, plaintiffs have failed to meet their burden to show that strict scrutiny is required under the preliminary injunction analysis.  Though the court could go through the strict scrutiny analysis in deciding the City's motion to dismiss, it is telling that the City has not even addressed how it would possibly meet this standard.[16]  Moreover, the court ultimately finds that the City's motion to dismiss must be denied, even if the licensing requirement is entitled to intermediate scrutiny.  Therefore, the court finds it is unnecessary to conduct a strict scrutiny analysis, and will proceed to evaluate the licensing requirement under intermediate scrutiny.

For a law to meet the requirements of intermediate scrutiny, it "must be 'narrowly tailored to serve a significant governmental interest.'"  McCullen v. Coakley, 134 S. Ct. 2518, 2534 (2014) (quoting Ward, 491 U.S. at 796)).  This inquiry recognizes that the First Amendment "does not simply guard against an

---

[15]    As the late great philosopher Yogi Berra once said, "if you come to a fork in the road—take it."

[16]    The City does argue, in a footnote, that "if the court determines that the ordinance is content based . . . the ordinance regulates no more than commercial speech."  Def.'s Resp. 27 n.129.  However, as the City recognizes, commercial speech is "defined as that which 'does no more than propose a commercial transaction.'"  Moore-King v. Cty. of Chesterfield, Va., 708 F.3d 560, 568 (4th Cir. 2013) (quoting Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc., 425 U.S. 748, 762 (1976)).  Though the City points out certain similarities between its argument and the rationale proposed in Washington Tour Guides Ass'n v. National Park Service, those similarities only relate to the justifications offered to support the regulations, not the characterization of the speech being regulated.  See 808 F. Supp. 877, 880–81 (D.D.C. 1992).  The Washington Tour Guides decision dealt with a regulation prohibiting solicitation, which is clearly commercial speech.  See id. at 878–79.  Here, the City's license requirement burdens the speech prospective tour guides plan to share with customers after the transaction has been agreed to.  Thus, the City has offered no justification for characterizing such speech as "commercial."

impermissible desire to censor," and that a government may attempt to impermissibly restrict speech purely as a matter of convenience.  Id.  "[B]y demanding a close fit between ends and means, the tailoring requirement prevents the government from too readily 'sacrific[ing] speech for efficiency.'"  Id. at 2534–35 (quoting Riley v. Nat'l Federation of Blind of N.C., Inc., 487 U.S. 781, 795 (1988)).  Ultimately, for a content-neutral regulation "to be narrowly tailored, it must not 'burden substantially more speech than is necessary to further the government's legitimate interests.'"  Id. at 2535 (quoting Ward, 491 U.S. at 799).  While this does not require that a subject regulation "'be the least restrictive or least intrusive means of' serving the government's interests, . . . the government still 'may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals.'"  Id. (quoting Ward, 491 U.S. at 798, 799).

The Fourth Circuit recently examined how a court must apply the intermediate scrutiny analysis in Reynolds v. Middleton, 779 F.3d 222 (4th Cir. 2015).  The Reynolds court began by recognizing that once the plaintiff has shown that a particular regulation restricts speech, the burden shifts to the government "to prove the constitutionality of the speech restriction."  Id. at 226 (citing McCullen, 134 S. Ct. at 2540)).  The court then discussed the ways in which the government may establish the existence of a "significant governmental interest," noting that an evidentiary record is not always necessary and that "common sense and the holdings of prior cases have been found sufficient to establish" government interests in the past.  Id. at 227.  The court also found that, in light of the Supreme Court's recent decision in McCullen, "objective evidence is not always required to show that a speech

restriction furthers the government's interests." Id.  However, the court did find that McCullen requires "the government to present actual evidence supporting its assertion that a speech restriction does not burden substantially more speech than necessary; argument unsupported by the evidence will not suffice to carry the government's burden."  Id. at 229; see also Bruni v. City of Pittsburgh, — F.3d ——, 2016 WL 3083776, at *13 (3d Cir. June 1, 2016) ("McCullen required the sovereign to justify its regulation of political speech by describing the efforts it had made to address the government interests at stake by substantially less-restrictive methods or by showing that it seriously considered and reasonably rejected 'different methods that other jurisdictions have found effective.'").

### a.    Existence of Substantial Interest

Plaintiffs first argue that the government does not have a substantial interest in enforcing the licensing requirement because its stated interest is invalid.  Pls.' Mot. 19.  Plaintiffs contend that the City's interest in ensuring that tour guides are properly qualified is necessarily connected to an interest in managing the content of their speech, and thus, this interest cannot justify the City's regulation.[17]  Id.  Plaintiffs liken this case to Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Vill. of Stratton, 536 U.S. 150 (2002), in which the Supreme Court struck down a law requiring a permit to conduct door-to-door "canvassing" to promote a "cause."  The Watchtower Bible opinion does express some concern over permitting and licensing schemes,

---

[17]    This argument attempts to stop the intermediate scrutiny analysis before it even begins and bears a strong resemblance to plaintiffs' prior argument that the licensing regime must be analyzed under strict scrutiny because it lacked a content-neutral justification. Though the court has some doubt as to whether this argument is truly appropriate under the intermediate scrutiny framework, it ultimately finds the argument unpersuasive and therefore declines to consider whether or not it is duplicative.

noting that "a requirement of registration in order to make a public speech would seem generally incompatible with an exercise of the rights of free speech and free assembly." Id. at 164 (quoting Thomas v. Collins, 323 U.S. 516, 539 (1945)). However, Watchtower Bible also recognizes that this principle only applies "[s]o long as no more is involved than exercise of the rights of free speech and free assembly." Id. (quoting Thomas, 323 U.S. at 540).

Here, the City's stated interest does not simply involve the bare exercise of free speech. The City's interest in speech is derivative of its primary interest in preventing "false or misleading offers of service for compensation." Def.'s Resp. 23. The problem is not simply that unqualified guides may provide visitors with false information, it is that they may do so under the guise of providing "accurate" information, and that such behavior may harm visitors, residents, and the industry overall. The difference between what is promised and what is delivered is the core of the City's interest, not the content of the information itself. Moreover, the Watchtower Bible Court did not even rely on plaintiffs' rationale in reaching its holding. In Watchtower Bible, the Court struck down the permit requirement because it applied to more far more speech than necessary to further the government's stated goals and was therefore not narrowly tailored. Id. at 168–69. The Court even recognized that the three interests offered to support the permit requirement—which included an interest in "the prevention of fraud"—were legitimate. Id. at 165–66. Thus, Watchtower Bible does not support an attack on the basic legitimacy of the City's interests in this case.

Courts have recognized that governments have a legitimate and substantial interest in preventing fraudulent or misleading commercial operations and protecting their industries. Riley, 487 U.S. at 782 ("[A] State's interest in protecting [] the public from fraud is a sufficiently substantial interest to justify a narrowly tailored regulation."); Kagan, 753 F.3d at 561–62 (finding government interest in protecting tourism industry and visitors). As discussed above, the Fifth Circuit recently recognized such an interest when reviewing a similar tour guide licensing regime. Kagan, 753 F.3d at 561–62. In light of these prior decisions, the court finds that the City possesses a substantial interest in this case.

### b.    Advancement of Substantial Interest

The question of whether the licensing regime actually advances that interest is effectively uncontested. The City argues that its licensing requirement ensures that tour guides offering their services in Charleston are qualified because people unwilling to learn about the City's history are unlikely to pass the written examination. Def.'s Resp. 24. Plaintiffs do argue that because tours do not always focus on the city's history, there is no nexus between the information required to pass the test and the knowledge required to be a tour guide. Pls.' Mot. 19–20. However, this argument really goes to the degree to which the regime advances the City's interests. Few would doubt that the regime advances the City's interests with respect to all tour guides who discuss the topics covered by the written exam. Whether that benefit is sufficient to justify the regulation is another question. Therefore, the court finds that plaintiffs' "nexus" argument is better addressed under the final prong of the intermediate scrutiny analysis—whether the licensing requirement burdens

"substantially more speech than is necessary to further the government's legitimate interests." <u>McCullen</u>, 134 S. Ct. at 2535 (quoting <u>Ward</u>, 491 U.S. at 799) (internal quotation marks omitted).

Even if one rejects the premise that the licensing requirements are related to the qualifications necessary to act as a tour guides, there are still reasons to think that such requirements prevent unqualified individuals from misleading potential customers. By forcing prospective tour guides to commit time and energy into studying for the written examination, the license requirement effectively raises the costs of entry into the market. This would tend to dissuade fly-by-night tour operations, by making their schemes less profitable. It also demonstrates that candidates have some general ability to learn and associate information with various Charleston locations. While plaintiffs doubtlessly regard these measures as both excessive and imprecise, it does seem that prospective tour guides who can obtain a license under this regime are more likely to be knowledgeable and qualified, and less likely to take advantage of misinformed tourists, than those who cannot.

### c.     Excessive Burden on Speech

Thus, the court comes to the crucial question of whether the City's licensing requirement places an excessive burden on speech in relation to the interests it promotes. The Supreme Court has explained that a regulation is excessively burdensome when it "burden[s] substantially more speech than is necessary to further the government's legitimate interests." <u>Turner Broad. Sys.</u>, 512 U.S. 662 (quoting <u>Ward</u>, 491 U.S. at 799). Put differently "[g]overnment may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to

advance its goals." <u>Ward</u>, 491 U.S. at 799.  This standard does not require that the regulation employ "the least speech-restrictive means of advancing the [g]overnment's interests." <u>Turner Broad. Sys.</u>, 512 U.S. 662.  However, it does require that the government's interests "be achieved less effectively absent the regulation." <u>Id.</u> (quoting <u>Ward</u>, 491 U.S. at 799) (internal quotation marks omitted).

As discussed above, plaintiffs argue that there is no "nexus" between the licensing requirement and much of the speech made in the course of providing "tour guide services." Pls.' Mot. 19–20.  While the written examination requires prospective guides to learn about the city's history, licensed tour guides may provide tours dealing with ghosts, pubs, or any number of other topics. <u>Id.</u>  Because these tours do not require any particular competency or qualification, plaintiffs argue, the licensing regime burdens this speech unnecessarily.[18]  Plaintiffs then go on to list a number of other potential ways in which the City might promote its interests, suggesting:  (i) reliance on the free-market, particularly given the public's use of travel review websites; (ii) a voluntary certification program like the ones used in Baltimore or Philadelphia; (iii) hiring its own guides and operating City-run tours that compete with private tour operations; or (iv) prosecution under consumer-protection laws.  Pls.' Mot. 20–21; Pls.' Mot Ex. 2, Seifert Dec. ¶¶ 6, 7; Pls.' Reply 7–10.  Plaintiffs also note that the City's licensing requirement is unique—only four other cities in the United States license tour guides—and argue that this "suggests that the government 'has too readily forgone options that could serve its interests just as well,

---

[18]       The court has some doubts as to whether ghost and pub tours are truly unrelated to the city's history.  Nevertheless, the court accepts the premise that one <u>could</u> provide a tour that has nothing to do with the information tested by the City's written exam, even if plaintiffs have failed to offer an example of such a tour.

without substantially burdening' protected speech."  Pls.' Reply 8 (quoting McCullen, 134 S. Ct. at 2537).

The City argues that its regulations do not restrict more speech than necessary because they only regulate the sale of tour guide services, allowing plaintiffs to give tours and speak freely on any subject so long as they do not charge for such services. Def.'s Resp. 25–26; Def.'s Mot. 15–16.  The City cites the Ninth Circuit's opinion One World, 76 F.3d 1009, and the district court's opinion in Kagan v. City of New Orleans, 957 F. Supp. 2d 774 (E.D. La. 2013), aff'd sub nom. Kagan v. City of New Orleans, La., 753 F.3d 560 (5th Cir. 2014), cert. denied, 135 S. Ct. 1403 (2015), for support.  Both decisions noted that the particular regulations at issue did not forbid the respective plaintiffs from distributing their message without compensation and found that such laws survived intermediate scrutiny.  See One World, 76 F.3d at 1014 (noting that where peddling ordinance prevent plaintiffs from selling message-bearing shirts, plaintiffs could still "hand[] out literature, proselytiz[e] or solicit[] donations"); Kagan, 957 F. Supp. 2d at 781 (finding that the "[c]ity's licensing scheme" left open ample alternative channels of communication, because "[p]laintiffs do not need a license to speak and lead tours whenever, wherever, and containing whatever they please, just so long as they do not charge for them").

However, the One World court did not find that this fact alone showed that the regulation at issue was narrowly tailored.  The court also observed that "[t]he ordinance targets precisely the activity [] causing the problems the city legitimately seeks to ameliorate, and it doesn't sweep in expressive activity that doesn't contribute to those problems."  One World, 76 F.3d at 1014.  Here, it is at least arguable that the

City's regulations apply to expressive activity that does not contribute to the City's concern over unqualified tour guides, because it requires all prospective tour guides who charge for their services to pass the written examination, even if they give tours that do not require knowledge of the information tested by that examination.  Thus, the <u>One World</u> decision provides only marginal support for the City's position.

As for the City's reliance on <u>Kagan</u>, plaintiffs argue that the <u>Kagan</u> court failed to conduct the type of inquiry required under <u>McCullen</u> and <u>Reynolds</u>.  Pls.' Mot. 21–22.  As discussed above, the Fourth Circuit recently interpreted the Supreme Court's decision in <u>McCullen</u> to hold that "the government [must] present actual evidence supporting its assertion that a speech restriction does not burden substantially more speech than necessary; argument unsupported by the evidence will not suffice to carry the government's burden."  <u>Reynolds</u>, 779 F.3d at 229; <u>see also</u> <u>Bruni</u>, 2016 WL 3083776, at *13 (stating that "<u>McCullen</u> represents and important clarification of the rigorous and fact-intensive nature of intermediate scrutiny's narrow-tailoring analysis.").  Plaintiffs contrast the analysis in <u>Kagan</u> to the analysis conducted by the D.C. Circuit's opinion in <u>Edwards v. D.C.</u>, 755 F.3d 996 (D.C. Cir. 2014), arguing that the <u>Edwards</u> opinion illustrates the proper approach.  In <u>Edwards</u>, the circuit court evaluated whether there was any evidence that the purported interest was actually threatened by the regulated conduct or that less restrictive means were insufficient to accomplish the government's goals.  <u>See</u> <u>Edwards v. D.C.</u>, 755 F.3d at 1003 (finding that "the record contains no evidence ill-informed guides are indeed a problem for the [d]istrict's tourism industry," and that the absence of evidence in the

record suggesting the inadequacy of alternative, less restrictive means of protecting the district's interests was "fatal to the [d]istrict's regulatory scheme").

First, the court notes that the parties appear to exaggerate the difference in the analysis applied by the district court in Kagan and the D.C. Circuit in Edwards. [19] Though the Kagan court's analysis largely examined the licensing regime's operation in the abstract, this can be explained by the fact that the Kagan plaintiffs "focus[ed] their attack . . . on the 'substantial or important' interest prong of the test and [did] not seriously contest that the City's interest 'would be achieved less effectively absent the regulation.'" Kagan, 957 F. Supp. 2d at 782 (quoting Ward, 491 U.S. at 800). As such, the Kagan court had less reason to scrutinize the fit between the city's goals and the means employed to achieve them.

Nevertheless, the court does find that the D.C. Circuit's opinion in Edwards provides a somewhat better illustration of the analysis required under the Fourth Circuit's opinion in Reynolds. The Edwards court looked beyond the simple fact that alternative avenues of communication were available and evaluated the extent to which the government's regulation restricted speech in furtherance of its interests. By looking for evidence that the regulated conduct actually threatened the government's interests, and assessing the viability of alternative means of advancing such interests, the Edwards court was able to determine whether the regulation at issue was properly calibrated to its justifying purpose. This element of calibration

---

[19]    Plaintiffs actually direct their criticism at the Fifth Circuit's opinion affirming the district court, which was indeed quite concise. However, as noted above, the City cites to the Eastern District of Louisiana's opinion on this issue, which contained a more thorough analysis. See Kagan, 957 F. Supp. 2d at 781–82 (analyzing whether licensing requirement left open ample alternative channels of communication and whether government's interests would be achieved less effectively absent licensing requirement).

goes to the very heart of the constitutional requirement that the regulation "not 'burden substantially more speech than is necessary to further the government's legitimate interests.'" McCullen, 134 S. Ct. at 2535 (quoting Ward, 491 U.S. at 799).

In contrast, under the City's proposed analysis, the court might simply assume that because the licensing regime left open certain channels of communication, the channels that it foreclosed were narrowly tailored to protect the City's interests. While alternative channels of communication may provide indirect evidence of narrow tailoring, such evidence is not conclusive. Their availability says nothing about the burdened speech or its relationship to the government's interest. Moreover, if all the government needed to show was the bare existence of alternative channels of communication, it is not clear what role Reynolds's evidentiary requirement would play, since this showing could most often be made by looking at the text of the regulation itself.

Therefore, the court finds that the City must provide some evidence that: (i) unqualified tour guides posed a threat to its interests in protecting its tourism industry from fraud and deceit; and (ii) it did not forego readily available, less intrusive means of protecting those interests. McCullen, 134 S. C.t at 2437 (noting evidence that problems addressed by statewide abortion facility "buffer zones" only occurred at one location, analyzing other jurisdictions' laws protecting similar interests, and observing that the government never seriously attempted to solve the problem through less intrusive, readily available methods); Reynolds, 779 F.3d at 231 (comparing "broad swath of speech prohibited by the [roadside solicitation ordinance]" to evidence that roadside solicitation problems only posed a risk in one

section of the county, and noting that government never tried or considered less

restrictive alternatives); Edwards, 755 F.3d at 1003 (finding "no evidence ill-

informed guides are indeed a problem for the District's tourism industry," and that the

government failed to address why market incentives were insufficient to protect

consumers).

At the same time, the court does not believe this evidentiary showing is as

demanding as the Edwards opinion might suggest.  While the Edwards court cited the

fact that "the record contains no evidence ill-informed guides are indeed a problem

for the District's tourism industry," Edwards, 755 F.3d at 1003, the Reynolds decision

indicates that the government need not prove that its interests have actually been

harmed before implementing a content-neutral regulation.  See Reynolds, 779 F.3d at

224–25, 231 (recognizing that reports of roadway solicitations in certain areas may be

sufficient to implicate government's interest in traffic safety, though no injuries had

yet occurred).  Instead, it appears that evidence showing that the government's

interests are likely to be harmed is sufficient.  Id.  Perhaps some situations may

require more, but reason certainly cautions against an absolute requirement that

governments wait until damage has been done before implementing any content-

neutral regulations.

The court also rejects any suggestion that the government must prove that it

attempted to implement, or even considered, every possible less restrictive alternative

a plaintiff or court might imagine.  Bruni, 2016 WL 3083776, at *12 ("[W]e do not

suggest that the City must demonstrate that it has used the least-restrictive alternative,

nor do we propose that the City demonstrate it has tried or considered every less

burdensome alternative to its Ordinance.") (emphasis in original).  First, such a requirement would be in clear tension with the Supreme Court's repeated insistence that intermediate scrutiny does not require "'the least restrictive or least intrusive means of' serving the government's interests."  McCullen, 134 S. Ct. at 2535 (quoting Ward, 491 U.S. at 798).  Both McCullen and Reynolds scrutinized the government's treatment of "available" less restrictive alternatives.  Id. at 2539 ("[T]he Commonwealth has not shown that it seriously undertook to address the problem with less intrusive tools readily available to it.") (emphasis added); Reynolds, 779 F.3d at 232 ("[T]he County simply presented no evidence showing that it ever tried to use the available alternatives to address its safety concerns.").  In evaluating these "available" alternatives, McCullen and Reynolds focused on laws already on the books, laws used in other jurisdictions, or alternative formulations of the challenged regulations.  McCullen, 134 S. Ct. at 2539 (noting that the government did not identify any prosecutions under other laws "within the last 17 years" and that government failed to show "that it considered different methods that other jurisdictions have found effective"); Reynolds, 779 F.3d at 232 ("[T]here is no evidence that the County ever tried to improve safety by prosecuting any roadway solicitors who actually obstructed traffic, or that it ever even considered prohibiting roadway solicitation only at those locations where it could not be done safely.").  Neither court required the government to show that conducted an exhaustive survey of every less restrictive policy imaginable.[20]

---

[20]     Even the Edwards court's discussion of free market solutions was at least tethered to the fact that many other cities did not find it necessary to impose the licensing regime at issue in that case and here.  Edwards v. D.C., 755 F.3d at 1004 ("[S]cores of other U.S. cities that

Importantly, the less restrictive alternative inquiry presupposes that the proposed alternatives "would be at least as effective in achieving the legitimate purpose that the [challenged regulation] was enacted to serve." Centro Tepeyac v. Montgomery Cty., 722 F.3d 184, 190 (4th Cir. 2013) (quoting Reno v. ACLU, 521 U.S. 844, 874 (1997)). To the extent a particular alternative fails this test, the government is under no obligation to present evidence that it actually examined or attempted to implement that alternative. See id. (affirming denial of preliminary injunction where "the existing evidence was altogether inadequate to demonstrate [the efficacy of the] less restrictive alternatives proposed by [plaintiff]"). If plaintiffs could prevail by simply identifying some speculative less restrictive alternative, regardless of whether that alternative would actually work, the First Amendment would hardly allow for any regulation at all.

The McCullen decision is instructive on this issue. In McCullen, the Supreme Court recognized, and ultimately rejected, the government's argument that the available alternatives would fail to achieve the government's interests. McCullen, 134 S. Ct. at 2540. Notably, the Court conducted this analysis by simply looking to the structure of the alternative regulations and determining whether they could be used to protect the government's stated interests. See id. at 2539 (rejecting government's argument that prosecution under alternative laws would not be practicable, noting that problems did not appear widespread and that "the police appear [] capable of singling out lawbreakers"). The Court went on to distinguish Burson v. Freeman, 504 U.S. 191 (1992), where state-statute restricting political

---

have determined licensing tour guides is not necessary to maintain, protect, or promote the tourism industry.") (emphasis in original).

speech within 100 feet of polling places was "justified because less restrictive measures were inadequate." Id. at 2540. In Burson, the Court reasoned that "[i]ntimidation and interference laws fall short of serving a State's compelling interests because they 'deal with only the most blatant and specific attempts' to impede elections." Burson, 504 U.S. at 206–07 (quoting Buckley v. Valeo, 424 U.S. 1, 28 (1976)). Taken altogether, the McCullen Court's analysis indicates that while the government must certainly demonstrate that any proposed less restrictive measures were inadequate to advance its interests, this does not necessarily require evidence that the government actually implemented or specifically evaluated such alternatives. Instead, the analysis may be guided by whether the alternative regulation would cover the problematic activity, see McCullen, 134 S. Ct. at 2538 (analyzing provisions of existing local ordinances and laws of other jurisdictions), and whether enforcement of such alternatives is likely to be practicable. See id. at 2540 (finding that problems were not so widespread, difficult to detect, or difficult to prosecute that enforcement through more specific regulations would be impracticable).

### i.    Motion to Dismiss

Applying these evidentiary requirements to the City's motion to dismiss, it is clear that plaintiffs have stated a plausible claim for relief. The complaint sufficiently alleges that the City has no evidence that unlicensed tour guides have ever presented problems in Charleston, or any other city. Compl. ¶ 84 ("[T]he City has no evidence of any harm that has ever befallen the public due to a city's failure to require tour guides to pass an examination before they may work as guides."); Compl. ¶ 93

("[T]he City has no evidence of harms that would arise if the requirement to pass a written exam were removed."). Taking these allegations to be true, plaintiffs can plausibly argue that the licensing regime is unduly burdensome because the interests it protects are simply not at risk.

Even if unqualified tour guides did somehow threaten the City's interest, the complaint highlights an array of potential alternative measures that could address the City's concerns, such as a voluntary certification programs or targeted consumer-protection laws. Pls.' Mot. 20–21; Pls.' Reply 7–10. The complaint further alleges that the City has no evidence that such measures would be inadequate. Compl. ¶¶ 87–89. As discussed above, the City is entitled to challenge this assertion in a number of ways. For instance, unqualified tour guides may be somewhat difficult to detect, making prosecution under consumer protection laws impracticable, and voluntary certification programs may lack the legal force necessary to protect the City's interests. However, these arguments have not been fully explored on the current record, and certainly cannot be resolved on the face of the complaint.[21] Thus, the City has failed to show how plaintiffs' allegations are insufficient to support their claims, and the City's motion to dismiss must be denied.

## ii.     Motion for Preliminary Injunction

Assessing this issue under the preliminary injunction standard is, unsurprisingly, more difficult. The City characterizes plaintiffs' focus on the evidentiary requirements set forth in Reynolds as an "attempt[] to flip the preliminary

---

[21]     The court notes that both Kagan and Edwards, the two cases most factually similar to this one, as well as McCullen and Reynolds, the two most authoritative cases in articulating the appropriate evidentiary standard, were all decided on summary judgment records—or in the case of McCullen, after a bench trial.

injunctive standard on its head," because the clear showing burden lies with the plaintiffs, as the moving party.  Def.'s Supp. Resp. 6.  While it is true that plaintiffs bear the ultimate burden of making a clear showing that they are likely to prevail on the merits, Fourth Circuit precedent requires the court to evaluate the merits on the basis of the current record.  See Newsom ex rel. Newsom v. Albemarle Cty. Sch. Bd., 354 F.3d 249, 255, 261 (4th Cir. 2003) (evaluating the movants likelihood of success on the merits on the basis of "the record as it has developed through the preliminary injunction stage of the case" while cautioning that "our holding, like any ruling on a preliminary injunction, does not preclude a different resolution of [the movant]'s claims on a more fully developed record"); see also Greater Baltimore Center, 721 F.3d at 289 (recognizing that, even when "it was essential to the City's opposition to the Center's summary judgment motion . . . for the district court to have awaited discovery," the district court could still impose a preliminary injunction).  Thus, the court cannot simply ignore the gaps in the City's evidence or speculate that evidence will eventually emerge.

Still, on the record before it, the court does not find that plaintiffs are likely to prevail at trial, especially under the heightened standard applicable here.  The court first observes that the licensing regime burdens a rather small range of speech— namely, speech given in connection with hired tour guide services.  Charleston City Code § 29-58.  This is not a case like McCullen or Reynolds, where speakers were absolutely prohibited from engaging in certain forms of speech in certain locations. McCullen, 134 S. Ct. at 2535 (noting the "serious burdens" imposed by the abortion facility "buffer zone" regulations, which "carve out a significant portion of the

adjacent public sidewalks, pushing petitioners well back from the clinics' entrances and driveways"); Reynolds, 779 F.3d at 231 (finding that roadside solicitation ordinance "prohibit[ed] all forms of leafletting, which is one of the most important forms of political speech . . . as well as soliciting any kind of contribution, whether political or charitable, or selling or attempting to sell goods or services").  Unlicensed individuals may engage in tour guide speech as much as they desire, so long they do not charge for it.  Moreover, paid tour guide speech is not a form of expression that "[has] historically been [] closely associated with the transmission of ideas." McCullen, 134 S. Ct. at 2536.  Thus, burdening such speech only marginally impedes on "the principle that each person should decide for himself or herself the ideas and beliefs deserving of expression, consideration, and adherence." Turner Broad. Sys., 512 U.S. at 641.

The court also notes that there is very little evidence in the record that the licensing regime imposes any significant burdens on speech that "do[] not serve to advance its goals." McCullen, 134 S. Ct. at 2535 (quoting Ward, 491 U.S. at 799). To the extent tour guides actually offer information covered by the written examination, the burden of taking that examination is justified because it actually serves its intended purpose.  While it is certainly possible to offer a tour that does not discuss the city's history, the record does not indicate that such tours are especially prevalent in Charleston.  It is not even clear that the ghost or pub tours identified by plaintiffs are truly unrelated to the city's history.[22]  Perhaps non-historical tours are

---

[22]    The record does not even indicate that any of the plaintiffs plan to provide tours that have no "nexus" with the City's written examination.  Kimberly Billups and Michael Nolan, by their own admission, plan to give tours dealing primarily with the city and its history. Compl. ¶¶ 33, 63.  While Michael Warfield plans to give "ghost" and "pub" tours, and alleges

rare because the licensing regime has prevented the development of such operations.
Nevertheless, the court finds the content of the Charleston tourism market relevant in determining whether the licensing regime burdens more speech than necessary.  See Greater Baltimore Center, 721 F.3d at 282 (finding that, where pregnancy center's particular viewpoint on abortion affected validity of challenged ordinance, court "could not [] evaluate the [o]rdinance's validity in all or most of its applications without evidence concerning the distinctive characteristics of Baltimore's various limited-service pregnancy centers").  Here, there is little, if any, evidence that the City's licensing regime is often applied to persons offering, or seeking to offer, non-historical tours.

　　　　Thus, at this stage of the litigation, the record suggests that the City's licensing regime imposes only a minor burden on speech.  This fact must be considered in determining whether the City has 'burden[ed] substantially more speech than is necessary to further the government's legitimate interests.'"  McCullen, 134 S. Ct. at 2535 (quoting Ward, 491 U.S. at 799); Watchtower Bible, 536 U.S. at 165 ("We must also look, however, to the amount of speech covered by the ordinance and whether there is an appropriate balance between the affected speech and the governmental interests that the ordinance purports to serve."); see also Bruni, 2016 WL 3083776, at *13 n.20 (recognizing that some regulations may impose "such a slight burden on speech, [that] any challengers would struggle to show that alternative

---

that the written examination does not contain any questions on such topics, these allegations fail to disclose the actual content of Warfield's tours.  Id. ¶¶ 48, 56.  The fact that the written examination did not specifically ask about ghosts or pubs does not mean that stories about ghosts or pubs do not draw upon the information contained in the written examination.  Thus, plaintiffs have failed to clearly show that the licensing regime fails to advance the City's interests, even when applied to them.

measures would burden <u>substantially</u> less speech.") (internal quotation marks removed).

Keeping this principle in mind, the court turns to the City's evidence of narrow tailoring.  As noted above, the City has not shown that unscrupulous tour guides have ever caused any harm to the tourism industry in Charleston.  However, the City has presented evidence that it is a highly regarded tourist destination, Riley Aff. ¶ 3, and that "fake tour guides" target such destinations.  Def.'s Supp. Resp. 7 n.27 (recommending a Google search for "fake tour guides").  While this evidence is certainly not conclusive, the court finds that it at least indicates that Charleston possesses the somewhat unique attributes that may attract unscrupulous tour guide activity, and thus, the City has some non-speculative reasons for believing its interests are at risk.  Moreover, the City apparently shares these concerns with four other American cities.  Pls.' Mot. 4.  While plaintiffs make much of the fact that this evidence must be weighed against "the scores of other U.S. cities that have determined licensing tour guides is <u>not</u> necessary," Pls.' Mot. 20 (quoting <u>Edwards</u>, 755 F.3d at 1004 (emphasis in original)), the court is not convinced by this argument at this early stage.  It would certainly seem that the proper group for comparison is not all other U.S. cities, but other U.S. cities with comparable tourism industries. Because neither party has shown how these considerations affect the analysis, the fact that licensing regulations are used in other jurisdictions provides some support for the City's concerns.[23]

_____

[23]    The court notes that the City should also provide more information on the laws in these other jurisdictions if it wishes to rely on such evidence at summary judgment.  <u>Edwards</u>, 755 F.3d at 1004 ("[A]n indiscriminate survey of the laws of other jurisdictions without

Plaintiffs also complain that the City has failed to present evidence that it considered less-restrictive alternatives.  Pls.' Mot. 20–21; Pls.' Reply 8.  The court agrees that the City has failed to present any evidence that it took specific efforts to examine any such alternatives.  However, the court remains unconvinced that the plaintiffs' proposed measures would adequately protect the City's interests.  Because the City has presented some evidence that unscrupulous, unqualified tour guides pose a threat to consumers, the court finds there is also reason to believe that plaintiffs' proposed reliance on "market forces" is insufficient.  The very fact that the problem exists suggests that it has escaped the grasp of the invisible hand.  Plaintiffs also suggest the City adopt a voluntary licensing program, but note only two other cities where such programs exist, and in both instances, the programs are run by private organizations.  Pls.' Mot. 4.  To the extent plaintiffs suggest the City rely on a private organization to establish a voluntary certification program, the court considers such a suggestion indistinguishable from reliance on "market forces."  To the extent plaintiffs suggest that the City establish its own voluntary certification program, the record contains no indication that any other jurisdictions have adopted this approach, much less jurisdictions with similar tourism markets.  As set forth above, the court does not believe that the City was required to identify and examine every possible method of addressing its concerns before implementing the licensing regime.  Ward, 491 U.S. at 797 (recognizing that narrow tailoring analysis does not require "sifting through all the available or imagined alternative means of [achieving the desired end]"); Bruni, 2016 WL 3083776, at *12 ("[We do not] propose that the City

marshaling any evidence about why those laws were enacted and how the regulations are enforced is not sufficient.") (emphasis in original).

demonstrate it has tried or considered <u>every</u> less burdensome alternative to its

Ordinance.").  Consequently, the court finds that the use of privately run voluntary

certification programs in two other cities does not clearly establish such programs as

"readily available," adequate alternatives.[24]  Finally, there is reason to think using

available consumer protection laws would be ineffective, since the entire basis of a

"fake tour guide" scam is that unqualified tour guides are indistinguishable from other

tour guides, and therefore, difficult to detect.  <u>McCullen</u>, 134 S. Ct. at 2540

(distinguishing <u>Burson</u>, where use of targeted prosecutions would have been

ineffective because the problematic activities were "difficult to detect").  In light of

these considerations, the court finds the "existing evidence [] altogether inadequate to

demonstrate that less restrictive alternatives proposed by [plaintiffs] 'would be at

least as effective in achieving the legitimate purpose that the [licensing regime] was

enacted to serve." <u>Centro Tepeyac</u>, 722 F.3d at 190 (quoting <u>Reno v. ACLU</u>, 521

U.S. at 874).[25]

  In sum, the court is asked to enjoin the enforcement of a licensing scheme that

does not impose an especially sizable burden on speech, where there is at least some

evidence that the substantial interests that scheme is designed to protect are at risk.

While the record does not show that the City gave any consideration to the less-

restrictive alternatives proposed by plaintiffs, questions remain as to whether such

proposals would protect the City's interests as well as the licensing requirement.

Even if these alternatives were effective, the fact that the licensing scheme imposes

---

[24]  The same reasoning applies to plaintiffs' suggestion that the City hire its own tour guides or provide government-sponsored education, Pls.' Mot. 20, as there is no indication that these approaches have ever been enacted elsewhere.

[25]  As the record develops, it may become clear that these alternatives demand the City's consideration.

only a modest burden on speech makes it highly unlikely that the alternatives would burden "substantially less speech." McCullen, 134 S. Ct. at 2540 (emphasis added). Under these circumstances, the court cannot find that plaintiffs have met their heightened burden to clearly show a likelihood of success on the merits.

### B.    Irreparable Harm

"[I]n the context of an alleged violation of First Amendment rights, a plaintiff's claimed irreparable harm is 'inseparably linked' to the likelihood of success on the merits of plaintiff's First Amendment claim." WV Ass'n of Club Owners & Fraternal Servs., Inc. v. Musgrave, 553 F.3d 292, 298 (4th Cir. 2009). This is because courts recognize the deprivation of First Amendment rights as an irreparable harm in and of itself. Newsom, 354 F.3d at 261 ("[T]he Supreme Court has explained that 'loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" (quoting Elrod v. Burns, 427 U.S. 347, 373 (1976))). Of course, since plaintiffs have not shown a likelihood of success on the merits of their First Amendment claim, that harm cannot be considered. The only other harm plaintiffs might suffer is the loss of potential income, which could easily be remedied through monetary relief at the conclusion of this litigation. Southtech Orthopedics, Inc. v. Dingus, 428 F. Supp. 2d 410, 418 (E.D.N.C. 2006) ("[I]t is axiomatic that purely economic injury, such as that resulting from lost sales, profits or market share, does not constitute irreparable harm sufficient to warrant injunctive relief."). Therefore, the court finds that plaintiffs have failed to make a clear showing of irreparable harm.

**C.      Balance of Equities and Public Interest**

The same dynamic determines whether the balance of the equities favors a grant of preliminary injunctive relief and whether such relief is in the public interest. As to the balance of the equities, the City would clearly suffer harm if it was prevented from enforcing the license requirement and protecting Charleston's tourism industry. Similarly, the public has an interest in preventing unscrupulous tour guides from misleading tourists.

Certainly, a government suffers no harm from the "issuance of a preliminary injunction which prevents it from enforcing a regulation[] which . . . is likely to be found unconstitutional," Newsom, 354 F.3d at 261, and "upholding constitutional rights serves the public interest." Id. However, because the court finds that plaintiffs have failed to demonstrate on the present record that they are likely to prevail on the merits, these considerations do not apply. Therefore, the court finds that plaintiffs have failed to make a clear showing as to the balance of the equities and the public interest.

## IV.   CONCLUSION

For the foregoing reasons the court **DENIES** the City's motion to dismiss and

**DENIES** plaintiffs' motion for preliminary injunction.

**AND IT IS SO ORDERED.**

_____
**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**July 1, 2016**
**Charleston, South Carolina**

45