**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | | |
|---|---|---|
| KIMBERLY BILLUPS, MICHAEL WARFIELD, and MICHAEL NOLAN, | ) ) ) | |
| Plaintiffs, | ) ) ) | Civil No. 2:16-cv-00264-DCN |
| vs. | ) ) | **ORDER** |
| CITY OF CHARLESTON, SOUTH CAROLINA, | ) ) ) | |
| Defendant. | ) ) | |
| _____ | ) | |

This matter is before the court on plaintiffs Kimberly Billups, Michael Warfield and Michael Nolan's (collectively, "plaintiffs") and defendant City of Charleston's (the "City") cross-motions for summary judgment, as well as the City's motion to strike plaintiff's Statement of Undisputed Material Facts ("SUMF"). For the following reasons, the court denies both motions for summary judgment and grants in part and denies in part the motion to strike.[1]

## I.   BACKGROUND

This dispute arises out of a First Amendment challenge to the City's regulation of tour guides. The city of Charleston, South Carolina draws millions of visitors every year and has developed a reputation for being one of the top tourist

_____

[1] The court has already granted the City's request to file additional briefing to address the purportedly facts contained in the SUMF. Any request for further relief is denied. The court acknowledges the City's consternation with the plaintiffs' submission of the SUMF without seeking consent from the City or leave from the court. While the court ultimately considered the SUMF in rendering its decisions, it reminds plaintiffs of the need to conform to this district's local rules.

destinations in the world.  ECF No. 43-2, Riley Aff. ¶ 3.  Given the size and

significance of the local tourism industry, the City has long regulated the industry in a

number of ways.  Id. ¶¶ 4–5.  Pursuant to Charleston City Code § 29-58, the City

currently prohibits any person from "act[ing] or offer[ing] to act as a tour guide in the

city for hire unless he or she has first passed a written examination and is licensed by

the [City]."  A "tour guide" is defined as a "person who acts or offers to act as a guide

for hire through any part of" certain regulated areas of the city.  Charleston City Code

§ 29-2.  The City defines a "tour or touring" as "the conducting of or the participation

in sightseeing . . . for hire or in combination with a request for donations."  Id.

In April of 2016—following the filing of this lawsuit, the City amended the

requirements for obtaining a tour guide license.  As the regulations currently stand,

the City requires prospective tour guides to pass the aforementioned written

examination and obtain a valid business license before qualifying for a tour guide

license.  Id.  The written examination is designed to "test the applicant's knowledge

of the city and its history," Charleston City Code § 29-59(b), and consists of 200

questions drawn from information provided in the Charleston Tour Guide Training

Manual (the "Manual"), a 490-page study guide detailing various historical,

architectural, cultural, and other information.  ECF No. 50-11, Manual Excerpts at 5,

6 (table of contents).  The stated purpose of the Manual "is to provide a wealth of

knowledge for prospective and current licensed tour guides" and to further "the city's

goal [of] provid[ing] accurate, factual and updated information to its visitors and

residents."  Id. at 482.  A prospective tour guide must correctly answer 70 percent of

the exam questions to pass.[2]  Charleston City Code § 29-59(f).  Once licensed, tour guides are required to attend four continuing education lectures every three years in order to extend the term of their license.  Charleston City Code § 29-63.  Otherwise, the license will lapse, and the tour guide will be required to retake the written examination.[3]  Id.

Prior to the recent amendments, the City also required prospective tour guides to pass an oral examination, wherein candidates would "act as a guide" in front of City officials and who would evaluate the candidates' performance on a "pass or fail basis."  ECF No. 39-2, Maybank Dep. 107:10–13; see also Ordinance § 3 (striking provisions requiring oral examination).  The oral exam tested both the accuracy and completeness of a prospective tour guide's performance, meaning that a prospective tour guide might fail the oral exam due to their failure to mention certain facts relevant to the tested area.  ECF No. 48-10, Mendelsohn Dep. 47:3–47:25.  The pre-amendment Code also allowed individuals to act as "temporary tour guides" under certain conditions.  Charleston City Code § 29-60 (2016).  "Temporary tour guides" were not required to pass the written examination described above, but were required to adhere to a script approved by the City.  Id. § 29-60(e), (g).  The City required the

---

[2] Prior to the recent amendments, prospective tour guides were required to correctly answer 80 percent of the exam questions to pass.  Compl. ¶ 17.  The recent amendments make the reduced 70 percent threshold retroactive to April 26, 2015.  ECF No. 26-1, Ordinance § 10.

[3] After maintaining a valid license for a period of 25 years, a tour guide obtains the status of "tour guide emeritus" and is relieved of any continuing education or testing requirements.  Charleston City Code § 29-63.

information contained in the approved scripts to be consistent with the Manual.  ECF No. 49-6, Tourism Commission Meeting Minutes 10/22/97 at 2.

Plaintiffs are individuals who wish to work as tour guides in Charleston, but failed to meet the 80 percent threshold required to pass the written licensing exam when they each took it in 2015.  Compl. ¶¶ 38, 52–55, 68.  Plaintiffs Kimberly Billups and Michael Warfield each scored over the current 70 percent threshold in November 2015 and August 2015, respectively.  Id. ¶¶ 38, 53.  Pursuant to the retroactive application of the new 70 percent threshold, Billups and Warfield are now working as licensed tour guides, although they remain subject to the City's continuing education requirements.  Charleston City Code § 29-63.  Plaintiff Michael Nolan still has not passed the written examination and remains ineligible for a tour guide license.

On January 28, 2016, plaintiffs filed a complaint alleging that the City's tour guide license requirement violates the First Amendment of the United States Constitution.  Compl. ¶¶ 103–06.  Plaintiffs moved for a preliminary injunction and the City moved to dismiss the complaint.  The court denied both motions on July 1, 2016 (the "2016 Order").  ECF No. 27.  On January 27, 2017, the parties each filed motions for summary judgment.  ECF Nos. 39, 40.  On February 1, 2017, the City filed its motion to strike plaintiffs' SUMF.  ECF No. 52.  Plaintiffs filed a response to the motion to strike on February 3, 2017, ECF No. 53, and the City filed a reply on February 9, 2017.  ECF No. 56.  The parties then filed responses in opposition to the summary judgment motions on February 24, 2017.  ECF Nos. 61, 62.  The parties filed their replies on March 17, 2017.  ECF Nos. 65, 66.  The court held a hearing on April 6, 2017.  On April 21, 2017, the City filed a sur-reply to address the arguments

contained in plaintiffs' SUMF.  ECF No. 72.  The matter is now ripe for the court's review.

## II.  STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "Rule 56(c) of the Federal Rules of Civil Procedure requires that the district court enter judgment against a party who, 'after adequate time for discovery . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'"  Stone v. Liberty Mut. Ins. Co., 105 F.3d 188, 190 (4th Cir. 1997) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)).  Any reasonable inferences are to be drawn in favor of the nonmoving party.  See Webster v. U.S. Dep't of Agric., 685 F.3d 411, 421 (4th Cir. 2012).  However, to defeat summary judgment, the nonmoving party must identify an error of law or a genuine issue of disputed material fact.  See Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); see also Bouchat v. Balt. Ravens Football Club, Inc., 346 F.3d 514, 522 (4th Cir. 2003).

Although the court must draw all justifiable inferences in favor of the nonmoving party, the nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence.  See Anderson, 477 U.S. at 252; Stone, 105 F.3d at 191.  Rather, "a party opposing a properly supported motion for summary judgment . . . must 'set forth specific facts showing that there is a genuine issue for

trial.'" Bouchat, 346 F.3d at 522 (quoting Fed. R. Civ. P. 56(e) (2002) (amended 2010)). If the adverse party fails to provide evidence establishing that the factfinder could reasonably decide in his favor, then summary judgment shall be entered "regardless of '[a]ny proof or evidentiary requirements imposed by the substantive law.'" Id. (quoting Anderson, 477 U.S. at 248).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. When the party moving for summary judgment does not bear the ultimate burden of persuasion at trial, it may discharge its burden by demonstrating to the court that there is an absence of evidence to support the non-moving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). The non-movant must then "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322.

### III.  DISCUSSION

The flashpoints of this litigation at the summary judgment stage are much the same as they were at the preliminary injunction stage. Plaintiffs argue that the City's licensing law should be subject to strict scrutiny because it is a content-based regulation of speech, while the City contends that the law is content-neutral, and therefore, subject to only intermediate scrutiny.[4] Plaintiffs further argue that, even if

_____

[4] The City does appear to have abandoned its argument that the law does not regulate speech at all, and is therefore not subject to any First Amendment scrutiny at all.

the law is deemed to be content-neutral, it fails under intermediate scrutiny.  The

City, of course, disagrees.

Thus, the court must revisit many of the same issues addressed in its 2016

July 1, 2016 order denying plaintiffs' motion for a preliminary injunction (the "2016

Order").[5]  While the parties have provided fairly lengthy briefs and an extensive array

of exhibits to support their arguments, the court finds that neither of the major

issues—the appropriate level of scrutiny and whether the City's licensing scheme

passes that level of scrutiny—can be resolved at the summary judgment stage.

### A.     Appropriate Level of Scrutiny

"The First Amendment, applicable to the States through the Fourteenth

Amendment, prohibits the enactment of laws 'abridging the freedom of speech.'"

Reed v. Town of Gilbert, Ariz., 135 S. Ct. 2218, 2226 (2015) (quoting U.S. Const.,

Amdt. 1).  The animating purpose behind the First Amendment "lies [in] the principle

that each person should decide for himself or herself the ideas and beliefs deserving

of expression, consideration, and adherence."  Turner Broad. Sys., Inc. v. F.C.C., 512

U.S. 622, 641 (1994).  Thus, "a government, including a municipal government

vested with state authority, 'has no power to restrict expression because of its

message, its ideas, its subject matter, or its content.'"  Reed, 135 S. Ct. at 2226

(quoting Police Dept. of Chicago v. Mosley, 408 U.S. 92, 95 (1972)).  "Content-based

laws—those that target speech based on its communicative content—are

---

[5] The court notes that the parties have not challenged most of the legal
standards and conclusions outlined in the court's 2016 Order.  Therefore, much of
this order is drawn from that decision.

presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." Id. "In contrast, [laws] that are unrelated to the content of speech are subject to an intermediate level of scrutiny, [] because in most cases they pose a less substantial risk of excising certain ideas or viewpoints from the public dialogue." Turner Broad. Sys., 512 U.S. at 642 (citing Clark v. Community for Creative Non–Violence, 468 U.S. 288, 293 (1984)). A law may be content-based in two ways: it may be content-based "on its face," or it may rely on a content-based "purpose and justification." Reed, 135 S. Ct. at 2228.

Plaintiffs argue that the licensing statute is both facially content-based, and dependent on a content-based justification. Pls.' Mot. 22–32.

### 1.   Content-Based on its Face

Plaintiffs argue that the licensing law is content-based on its face because it is triggered by speech communicating a particular message. Id. at 17. "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." Reed, 135 S. Ct. at 2227. Whether a regulation is content-based "on its face" must be judged by the "plain terms of the regulation." Satellite Broad. And Commc'ns Ass'n v. F.C.C., 275 F.3d 337, 353–54 (4th Cir. 2001) (quoting Chesapeake and Potomac Tel. Co. of Va. v. United States, 42 F.3d 181, 193 (4th Cir.1994), vacated on other grounds, 516 U.S. 415 (1996)). The Supreme Court has explained that while "[s]ome facial distinctions based on a message are obvious, . . . others are more subtle, [such as] defining regulated speech by its function or purpose." Reed, 135 S. Ct. at 2227. Examples of

functional or purpose-based categories of speech include "marketing" speech, see Sorrell, 131 S. Ct. at 2663 ("The statute thus disfavors marketing, that is, speech with a particular content."), speech "directing the public to church," Reed, 135 S. Ct. at 2227, and speech "designed to influence the outcome of an election." Id.

At the preliminary injunction stage, the court analyzed the plain language of the licensing law and determined that it was not content-based on its face. 2016 Order at 14–16. As the court explained:

> [I]t is very difficult to functionally define the speech required to perform "tour guide services" or "act[ ] as a guide" without circularly referring to speech made in the course of such conduct. . . . The most that can be said is that acting as a tour guide requires one to speak with the function or purpose of acting as a tour guide. Whatever the Court intended when it held that a law may be content-based if it facially distinguishes between categories of speech defined by their "function or purpose," Reed, 135 S.Ct. at 2227, it cannot have meant that every law restricting conduct also imposes a content-based restriction on speech made in the course of such conduct. This rationale would effectively remove the distinction between speech and conduct, and require almost every regulation to pass strict scrutiny under the First Amendment.

Id. at 14–15.

Plaintiffs argue that discovery has clarified what it means to provide "tour guide services" and "act[] as a guide," within the meaning of the licensing law, highlighting evidence that the City's interpreted those terms to refer to speech discussing the various points of interest along a tour route. For instance, plaintiffs point out that the City's Corporation Counsel described the definition of touring as "giving different pointers as to what buildings were of historic significance" at a meeting of the City's Tourism Commission. ECF No. 47-7, Tourism Commission Meeting Minutes 10/22/97 at 1–2. Mayor John Tecklenburg, who testified as a

30(b)(6) witness, similarly defined "giving [a] tour" as "being paid for hire to expound of the history of our city."  ECF No. 47-2, Tecklenburg Dep. 31:5–8. Longtime Charleston Mayor Joe Riley, who testified as a 30(b)(6) witness, indicating that the law would not apply to the driver of a vehicle who plays a recording of a licensed tour guide talking about Charleston, suggesting that the law only applies when the person guiding the customer through the city actually discusses points of interest around Charleston.  ECF No. 47-1, Riley Dep. 57:12–22.[6]  Indeed, it appears that this hypothetical is grounded in actual events, as licensed tour guide Thomas Dew ("Dew") testified that the City was prepared to install iPads loaded with a touring app in buses and rickshaws, allowing passengers to access "tour content" without requiring the drivers to obtain tour guide licenses.  ECF No. 50-5, Dew Dep. 61:10–14.

All of this evidence suggests that the City considered "acting as a tour guide" to mean providing information about various sites and locations along a tour route. This would seem to be a functionally defined category of speech.  See Reed, 135 S.

---

[6] The court notes that it is not entirely clear that Mayor Riley actually settled on this position.  After the cited exchange, plaintiffs' counsel continued to discuss the hypothetical and Mayor Riley responded that

> If you hired a driver to drive you around town and you pay them to give you information about the city, then they should have a license because you're paying them to be -- you're paying them for the services of a tour guide, but they don't have a cassette -- a cassette is not -- I mean, holding a law book and you didn't pass the Bar exam doesn't mean somebody should pay you to represent them in court.

Riley Dep. 58:5–13.  This response seems to indicate that if a driver was hired to "give [] information about the city," then the driver would not be able to avoid the licensing requirement by simply playing a tape.

Ct. at 2227 (finding law that regulated particular topics or functions of signs to be content-based). However, the problem with this argument is none of it comes from the plain language of the Charleston City Code. Instead, the evidence all relates to the City's interpretation and enforcement of its licensing law, which is undoubtedly relevant in assessing the law's underlying "purpose or justification," but seems decidedly irrelevant in assessing the meaning of the statute "on its face." Plaintiffs have not explained how the City's intended meaning of the licensing law can be considered at this stage, and Fourth Circuit precedent indicates otherwise.

Therefore, the court finds that the licensing law is not content-based on its face.

### 2.        Content-Based Purpose or Justification

Even if a regulation is not content-based on its face, it may nevertheless be content-based if it was imposed with a content-based purpose or justification. Sorrell, 131 S. Ct. at 2664 ("Even if the hypothetical measure on its face appeared neutral as to content and speaker, its purpose to suppress speech and its unjustified burdens on expression would render it unconstitutional"). Where a regulation in facially content-neutral, "[t]he principal inquiry . . . is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989). As the court explained at the preliminary injunction stage, in determining whether a regulation was imposed with a content-based purpose or justification, "the court may consider formal legislative findings, the statute's stated purposes, as well as the 'inevitable effect' of the statute." 2016 Order at 16 (quoting Sorrell, 131 S. Ct. at 2664). The City appears to have

taken this statement to mean that the court can <u>only</u> consider these three factors. Def.'s Resp. 10. However, the court takes this opportunity to clarify that the inquiry is not so limited. While the three factors that the City focuses on were particularly significant to the analysis at the preliminary injunction stage, the Supreme Court has considered other factors, including the manner in which the government applies or enforces the regulation.[7] <u>See</u> <u>Ward</u>, 491 U.S. at 792–93 (finding regulation requiring performers to use the city's sound technician was not content-based because "the city requires its sound technician to defer to the wishes of event sponsors concerning sound mix").

Here, there is certainly evidence that the licensing law was designed with a content-based purpose in mind—namely, to promote the City's <u>version</u> of its history. This purpose can be inferred from design of the licensing scheme, which requires prospective tour guides to master certain historical, cultural, and architectural subjects before obtaining a license. Such a requirement tends to promote prospective tour guides who focus on those subjects, while discouraging tours focused on other subjects. Moreover, the plaintiffs have identified a fair amount of evidence that the City has an interest in what tour guides were telling their customers about the sites they visited along their tours—particularly with respect to the history of those locations. <u>See</u> Tourism Commission Meeting Minutes 10/22/97 at 1–2 (indicating that the licensing requirement would only apply to persons "giving different pointers

_____

[7] Lest there be another misunderstanding, the court has not attempted to identify every possible factor a court may consider in determining whether a statute is reliant on a content-based purpose or justification.

12

as to what buildings were of historic significance"); see also Tecklenburg Dep. 31:5–8 (defining "giving [a] tour" as "being paid for hire to expound of the history of our city"). In addition to the evidence identified in the previous section, plaintiffs cite Mayor Riley's testimony that the purpose of the licensing exam is to

> protect the quality and integrity of this special, unique American city and ensure that those who pay money to a licensed tour guide have somebody that is knowledgeable of the city, that can also answer their questions about the architecture and history of the City of Charleston with reasonable knowledge and accuracy.

Riley Dep. 122:23–123:5. Rhetta Mendelsohn ("Mendelsohn"), who helped write the Manual and Tourism Commission for a period of time, provided similar testimony. See ECF No. 48-1, Mendelsohn Dep. 61:11–14 (stating that the examination requirement provides proof that the "guides have a basic knowledge of what they should be talking about in the city, what they should be telling people, what people should be getting"). The Manual itself indicates that tour guides "serve as the city's ambassadors" and that their "knowledge" is "representative" of the city. Manual Excerpts at 482. Plaintiffs argue that these statements reveal a content-based purpose because they prove that the City wants tour guides to provide certain information to visitors when asked about certain topics. Pls.' Mot. 27.

Plaintiffs also highlight more indirect evidence of the City's intent, including the recent repeal of the oral examination requirement and temporary tour guide provisions, which allowed the City to evaluate the actual content of a prospective tour guide's presentation. Though these provisions are no longer in effect, plaintiffs contend that they still provide evidence of the City's original purpose—controlling the content of information provided on tours. Pls.' Mot. 23–24. Finally, plaintiffs

point out several other actions taken by City officials exhibited that, in plaintiffs' view, demonstrate the City's interest in the content of the information conveyed by tour guides. For example, the City published a document entitled "Information for New Tour Guides," which stated that tour guides were "responsible [for saying], 'the legend is,' or 'tradition says' . . . etc. when sharing information that is not factual," and requesting that tour guides not make up answers to questions they did not know. ECF No. 49-8, Information for New Tour Guides; see also Maybank Dep. 127:22–129:25 (discussing memo sent to carriage operators requesting that they "adhere to information in the [Manual]" and the City's practice of "following up" when informed that a tour guide provided false information).

Taken together, this evidence would be enough for a reasonable trier of fact to find that the City's underlying motive was to influence the information provided by Charleston's tour guides and promote the City's preferred viewpoint or content. Thus, the City's motion for summary judgment could be denied before the court even reaches the intermediate scrutiny analysis.[8]

However, this is not the only conclusion a reasonable trier of fact could reach. The City argues that it was never concerned with the content of the tour guides speech for content's sake, but instead, it was only concerned with prohibiting tour guides from deceiving their customers by distributing inaccurate information. Def.'s Resp. 10. The City cites some of the same testimony cited by the plaintiffs in support

---

[8] The City has not attempted to show that the licensing law could survive strict scrutiny, therefore, the court assumes if strict scrutiny applies, the plaintiffs must prevail.

of this argument. For example, the City points out that when Mendelsohn's testimony is read in full, it indicates that the intended function of the licensing examination was to "ensure that people have a basic knowledge that they need to conduct business in the city, trying to ensure that people get their money's worth and that the guides are following the laws of the city." Mendelson Dep. 61:11–19.

Mayor Riley echoed this view:

> The benefit of the exam or benefit of having a licensing requirement for tour guides in the City of Charleston is that you prevent the five million visitors who come here from being scammed by people who don't know anything about the city's history with any kind of depth and knowledge and take their money, and also then have people that could be out there dressed or acting like they're tour guides that want to do something untoward.

Riley Dep. 123:16–25.

The City has also provided evidence that it designed the exam and continuing education requirements to address topics that tour guide customers are most interested in. See ECF No. 43-1, Charleston Visitor Survey Report at Bates No. 003527 (concluding that "the Charleston area's history and historic attractions have remained and will presumably continue to be the most important factor in visitors' decision to visit Charleston"); Maybank Dep. 130:17–24 (explaining that the City attempts to tailor continuing education courses to issues that visitors mention they wish they had learned more about). This evidence suggests that the City's regulation is not designed to advance the City's own content preferences because it "[takes] the desires of tourism industry participants as its starting point." 2016 Order at 19. The City also points out that the licensing law did not provide any mechanism for the City to either monitor or punish deviations from the Manual. Though the City certainly asked tour

guides to provide accurate information, this does not necessarily mean the City wanted to stifle any particular viewpoint or content-based category of speech. Finally, as to the 2016 amendments to the City Code that removed the oral examination requirement and the temporary tour guide license provision, Mayor Tecklenburg has testified that he had concerns about the tour guide licensing regulations during his mayoral campaign in 2015. Tecklenburg Dep. 17:12–18:21. It should be noted that Mayor Tecklenburg did not testify that he had concerns about those specific provisions before he took office. However, he did explain that one of his concerns was that the exam needed to be offered more frequently, and that once this was accomplished, the temporary tour guide provision was unnecessary. Id. at 18:20–21, 22:3–9.

When this evidence is viewed in the light most favorable to the City, a reasonable trier of fact could find that the City's true motive was to ensure that tour guide customers received the product the benefit of their bargain. Plaintiffs argue that even if the City's evidence is to be believed, this motive is not content-neutral because it still implicates the content of tour guides' speech. Pls.' Reply 6. This makes some intuitive sense. The City can hardly deny that the licensing law focuses on the content of the tour guides' speech, even if this focus is only a means to a content-neutral end. However, a close examination of the Supreme Court's decisions in Reed and Ward reveals that a facially content neutral regulation may impact the content of speech and still avoid strict scrutiny, so long as the government's ultimate purpose is content-neutral.

16

In <u>Reed</u> the Supreme Court found that the Court of Appeals erred in finding that a town's sign regulations "[were] content neutral because the Town 'did not adopt its regulation of speech [based on] disagree[ment] with the message conveyed,' and its justifications for regulating temporary directional signs were 'unrelated to the content of the sign.'" <u>Reed</u>, 135 S. Ct. at 2227 (alterations in original) (quoting <u>Reed v. Town of Gilbert, Ariz.</u>, 707 F.3d 1057, 1071–72 (9th Cir. 2013)). The Court explained that this was based on the Court of Appeals misunderstanding of its prior decision in <u>Ward</u>, which dealt with a "facially content-<u>neutral</u>" regulation. <u>Id.</u> at 2228 (emphasis added). This distinction was crucial because the regulations at issue in <u>Reed</u> were deemed to facially content-based. <u>Id.</u> However, in distinguishing <u>Ward</u>, the Court recognized that when a regulation is facially content-neutral, the court must "look[] to governmental motive, including whether the government had regulated speech 'because of disagreement' with its message, and whether the regulation was 'justified without reference to the content of the speech.'" <u>Id.</u> at 2228–29 (quoting <u>Ward</u>, 491 U.S. at 791). Indeed, the <u>Ward</u> decision explicitly recognized that a regulation which "serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages, but not others." <u>Ward</u>, 491 U.S. at 791. Thus, when a regulation is content-neutral on its face, the "principal inquiry . . . is whether the government has adopted a regulation of speech because of disagreement with the message it conveys."

The City's explanation of its motives satisfies this test. The City claims that, at its core, the licensing regime is intended to protect its tourism industry by ensuring that tour guide customers get what they pay for. Def.'s Resp. 10. The City basically

adopts the court's formulation of its motives in the 2016 Order, where the court explained that

> [t]he problem is not simply that unqualified guides may provide visitors with false information, it is that they may do so under the guise of providing "accurate" information, and that such behavior may harm visitors, residents, and the industry overall. The difference between what is promised and what is delivered is the core of the City's interest, not the content of the information itself.

Id. at 19 (quoting 2016 Order at 24). On this view, the City's interest in the specific contents of a tour guide's speech is secondary to its ultimate goal of ensuring that tour guide customers are not deceived. These motives are clearly entitled to intermediate scrutiny under Ward's "principal inquiry" because they have nothing to do with the City's own view of the messages the tour guides convey. Ward, 491 U.S. at 791 ("The principal inquiry in determining content neutrality, in speech cases generally and in time, place, or manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it conveys."). The Fifth Circuit reached a very similar conclusion in Kagan, where it analyzed the City of New Orleans's tour guide licensing statute and found that the city's desire to "identif[y] those tour guides who . . . are reliable, being knowledgeable about the city and trustworthy, law-abiding and free of drug addiction" to be content neutral. Kagan v. City of New Orleans, La., 753 F.3d 560, 561 (5th Cir. 2014) cert. denied, 135 S. Ct. 1403 (2015).[9]

---

[9] Notably, the district court in Edwards v. District of Columbia, 943 F.Supp.2d 109, 121 (D.D.C. 2013), also found the District of Columbia's tour guide licensing requirement to be content-neutral. Though the D.C. Circuit ultimately reversed the district court's decision, it did not address the district court's finding on this issue. See Edwards v. D.C., 755 F.3d 996, 1001 (D.C. Cir. 2014) ("[W]e will assume, arguendo, the validity of the District's argument that the regulations are

The fact that the City's licensing regime may unintentionally promote certain viewpoints—namely, the ones the City thinks tourists wish to hear—is only a collateral consequence of means utilized to pursue its ultimate goal. <u>Ward</u>, 491 U.S. at 791 ("A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others."). Ultimately, "[g]overnment regulation of expressive activity is content neutral so long as it is '<u>justified</u> without reference to the content of the regulated speech.'" <u>Ward</u>, 491 U.S. at 791 (emphasis in original) (quoting <u>Clark v. Cmty. for Creative Non-Violence</u>, 468 U.S. 288, 293 (1984)). To the extent the City's licensing laws regulate the content of the tour guides' speech, they only do so as a means to a content-neutral end—ensuring tour guide customers get what they pay for. Thus, if the trier of fact credits the City's explanation of its motives, the licensing requirement is "justified" without reference to the content of the regulated speech.

In conclusion, it is clear that the City's licensing scheme was designed to influence the information customers were being provided on guided tours, but this does not necessarily mean that the licensing law was content-based because there is a genuine dispute as to <u>why</u> the City wished to exercise such influence. Under <u>Reed</u> and <u>Ward</u>, if a law is facially content-neutral, the focus shifts to whether the City's ultimate goal is content-neutral, not the specific impact the law may have on one particular type of content or another.

**B.      Intermediate Scrutiny**

content-neutral and place only incidental burdens on speech."). Thus, every court that has addressed the issue has found tour guide licensing schemes to be content-neutral.

Plaintiffs contend that, even if City's licensing regulations are deemed to be content-neutral, they are still unconstitutional because the City has not presented sufficient evidence to meet the requirements of intermediate scrutiny. Pl.'s Mot. 29. The City contests this assertion. Def.'s Mot. 20–30.

The parties do not challenge the basic framework for evaluating intermediate scrutiny outlined in the court's 2016 Order. In the 2016 Order, the court explained:

> For a law to meet the requirements of intermediate scrutiny, it "must be 'narrowly tailored to serve a significant governmental interest.'" McCullen v. Coakley, 134 S. Ct. 2518, 2534 (2014) (quoting Ward, 491 U.S. at 796)). This inquiry recognizes that the First Amendment "does not simply guard against an impermissible desire to censor," and that a government may attempt to impermissibly restrict speech purely as a matter of convenience. Id. "[B]y demanding a close fit between ends and means, the tailoring requirement prevents the government from too readily 'sacrific[ing] speech for efficiency.'" Id. at 2534–35 (quoting Riley v. Nat'l Federation of Blind of N.C., Inc., 487 U.S. 781, 795 (1988)). Ultimately, for a content-neutral regulation "to be narrowly tailored, it must not 'burden substantially more speech than is necessary to further the government's legitimate interests.'" Id. at 2535 (quoting Ward, 491 U.S. at 799). While this does not require that a subject regulation "'be the least restrictive or least intrusive means of' serving the government's interests, . . . the government still 'may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals.'" Id. (quoting Ward, 491 U.S. at 798, 799).

2016 Order at 22–23.

The Fourth Circuit's decision in Reynolds v. Middleton, 779 F.3d 222 (4th Cir. 2015), evaluated the impact of the Supreme Court's McCullen decision on the intermediate scrutiny analysis. The Reynolds court recognized that the government need not produce evidence to show the existence of a "significant governmental interest,' observing that "common sense and the holdings of prior cases have been

found sufficient to establish" government interests in the past.  Id. at 227.  The court

also found that "objective evidence is not always required to show that a speech

restriction furthers the government's interests."  Id.  "However, the Reynolds court

did find that McCullen requires 'the government to present actual evidence

supporting its assertion that a speech restriction does not burden substantially more

speech than necessary; argument unsupported by the evidence will not suffice to carry

the government's burden.'"  2016 Order at 23 (quoting Reynolds, 779 F.3d at 229);

see also Bruni v. City of Pittsburgh, 824 F.3d 353, 371 (3d Cir. 2016) ("McCullen

required the sovereign to justify its regulation of political speech by describing the

efforts it had made to address the government interests at stake by substantially less-

restrictive methods or by showing that it seriously considered and reasonably rejected

'different methods that other jurisdictions have found effective.'").

        The only issue that plaintiffs can seriously dispute under the intermediate

scrutiny analysis is whether the licensing law burdens substantially more speech than

necessary.[10]  The court has already held that "governments have a legitimate and

substantial interest in preventing fraudulent or misleading commercial operations and

protecting their industries."  2016 Order at 25 (citing Riley, 487 U.S. at 782 ("[A]

State's interest in protecting [] the public from fraud is a sufficiently substantial

interest to justify a narrowly tailored regulation."); Kagan, 753 F.3d at 561–62

(finding government interest in protecting tourism industry and visitors)).  Just as

they did at the preliminary injunction stage, plaintiffs again try to shoehorn an

_____

    [10] This is sometimes referred to as the "narrow tailoring" requirement.

argument that the City's motives are content-based into the intermediate scrutiny analysis, claiming that "the government cannot regulate speech for the purpose of improving the quality of that speech." Pl.'s Resp. 23. But as the court explained in the 2016 Order, the City's desire to make sure that tour guides provide the services that customers expect simply cannot be equated with a desire to "improve" the quality of the tour guides' speech.[11] 2016 Order at 24 (explaining that, in the City's view, "[t]he problem is not simply that unqualified guides may provide visitors with false information, it is that they may do so under the guise of providing "accurate" information, and that such behavior may harm visitors, residents, and the industry overall"). It is also difficult to see how plaintiffs can argue that the licensing scheme does not advance the City's interest. It seems clear that forcing prospective tour guides to learn the information in the Manual would help ensure that the city's tour guides are knowledgeable enough to provide the services that their customers expect.

Thus, the only real argument is whether the City's regulation "burden[s] substantially more speech than is necessary to further the government's legitimate interests." Turner Broad. Sys., 512 U.S. at 662 (quoting Ward, 491 U.S. at 799). As

---

[11] The City has also presented evidence that it had reason to worry about unknowledgeable or fraudulent tour guides. The parties do not appear to dispute that Charleston is a highly regarded tourist destination, Riley Aff. ¶ 3, and the City has produced over 100 pages of news reports detailing a variety of incidents in other highly regarded tourist destinations involving unqualified or fraudulent tour guides and other similar scams. ECF No. 42-1. For instance, the City has provided articles discussing tours in Hollywood, California that falsely identified the homes of various ordinary Hollywood residents as celebrity homes. The City has also provided evidence that tour guide customers have actually lodged complaints about tour guides providing false or inaccurate information. ECF No. 62-1, Maybank Aff. ¶ 7. Therefore, the City has shown evidence that unscrupulous tour guides actual pose a threat to its interests.

an initial matter, the court is not convinced that the City's licensing regime creates a particularly significant burden on speech at all, much less a burden that substantially exceeds that which is necessary to further the City's legitimate interests. As the court observed in the 2016 Order, "the licensing regime burdens a rather small range of speech—namely, speech given in connection with hired tour guide services." Charleston City Code § 29–58. The City's licensing laws do not prevent any person from discussing any issue in any location. Instead, they prevent unlicensed persons from conducting certain forms of speech in specific parts of the city under very specific conditions—namely, for payment. The court has already examined the contrast between this case and cases like McCullen and Reynolds, where speakers were absolutely prohibited from engaging in certain forms of speech in certain locations. McCullen, 134 S. Ct. at 2535 (noting the "serious burdens" imposed by the abortion facility "buffer zone" regulations, which "carve out a significant portion of the adjacent public sidewalks, pushing petitioners well back from the clinics' entrances and driveways"); Reynolds, 779 F.3d at 231 (finding that roadside solicitation ordinance "prohibit[ed] all forms of leafletting, which is one of the most important forms of political speech . . . as well as soliciting any kind of contribution, whether political or charitable, or selling or attempting to sell goods or services").

Plaintiffs point out that "people—now and in the past—are remaining silent rather than speaking solely because of the licensing requirement," but this argument is simply not responsive to the issue. This case is well past the question of whether some speech is burdened; the question now is whether a substantial amount of speech is unnecessarily burdened. Discovery has closed and plaintiffs have identified four

people whose speech has been burdened—themselves and a tour guide named Paula Reynolds who leads multi-city tours through Charleston and is unable to conduct the Charleston portion of the tour herself.  ECF No. 39-5, Reynolds Dec. ¶¶ 14–16.  When this number is compared to the number of prospective tour guides who pass the exam every year, a reasonable trier of fact could find that the City's licensing regime simply does not place a very significant burden on speech.

Furthermore, the court remains convinced that "paid tour guide speech is not a form of expression that '[has] historically been [] closely associated with the transmission of ideas,'" McCullen, 134 S. Ct. at 2536, and thus, the City's licensing laws do not present a particularly grave threat to principles underlying the First Amendment.  Plaintiffs disagree and argue that paid tour guide speech "is exactly the kind of speech the Supreme Court referred to in McCullen as 'closely associated with the transmission of ideas'—it is 'normal conversation . . . on a public sidewalk.'" Pl.'s Mot. 30.  But the very fact that plaintiffs wish to be paid is one of the many reasons that their "conversations" with their customers cannot seriously be considered "normal"—normally, people do not pay for conversation.  There may some forms of paid speech that are also closely associated with the transmission of ideas— newspapers, speeches, books, movies, etc.—but plaintiffs cannot compare their paid tours with the conversations at issue in McCullen.  That case involved abortion opponents who wished to be able to approach patients entering abortion clinics in order to offer anti-abortion literature and engage them in ideologically-based conversations.  McCullen, 134 S. Ct. at 2536.  The McCullen decision observed that "'one-on-one communication' is 'the most effective, fundamental, and perhaps

economical avenue of political discourse.'" Id. (quoting Meyer v. Grant, 486 U.S. 414, 424 (1988)). The matters at issue in this case are simply not of the same character. Thus, the court concludes that the substantial burden inquiry must be framed by the initial observation that the City's regulations impose a rather small burden on a form of speech that is not "closely associated with the transmission of ideas." McCullen, 134 S. Ct. at 2536.

The City has also provided evidence that the magnitude of speech it unnecessarily burdens is very limited because most of the tours in Charleston focus on the subjects discussed in the Manual and continuing education classes. A 2016 report by the College of Charleston's Office of Tourism Analysis found that "the Charleston area's history and historic attractions have remained and will presumably continue to be the most important factor in visitors' decision to visit Charleston." Charleston Visitor Survey Report at Bates No. 003527; see also ECF No. 66-2, Hill Aff. ¶ 6(d) ("[V]isitors who travel to [Charleston] are likely to be interested in [Charleston's] history."). Plaintiffs have highlighted the existence of certain "non-historical" tours, such as ghost and pub tours, but there is testimony that even these tours draw on the city's history. See Reyonolds Dep. 207:11–16; ECF No. 44-2, Warfield Dep. 31:16–32:25. To the extent the City's licensing scheme burdens prospective tour guides who wish to give tours that draw on the material tested by written examination, those burdens are necessary for the scheme to advance the City's interest in protecting consumers. Concededly, the licensing scheme may place burdens on prospective tour guides who wish to give tours that do not draw on

information addressed in the Manual, but a reasonable trier of fact could find that very few prospective tour guides fall into this category.

Plaintiffs last argue that the City simply has not provided any evidence that it actually attempted to address its concerns using any alternative, less-restrictive means. Plaintiffs appear to be correct in this assertion. However, this does not render the licensing scheme unconstitutional. As the court explained in its 2016 Order, the City must show that "it did not forego readily available, less intrusive means of protecting those interests." 2016 Order at 31. But the City is not required to show that it "tried or considered every less burdensome alternative." Bruni, 2016 WL 3083776, at *12 (emphasis in original).

Plaintiffs have highlighted several possible alternatives, arguing that the City could rely on a voluntary certification program, operate or hire a company to conduct its own tours like Savannah, Georgia, or rely on the enforcement of fraudulent solicitation laws. Pls.' Mot. 32–33. Of course, the available alternatives requirement implicitly assumes that the alternatives would actually work. The City has presented evidence that each of plaintiffs' alternative proposals would be either impracticable or less effective than the current licensing scheme. For instance, Esther Banike, a long-time tour guide and Executive Secretary of the World Federation Tourist Guide Associations, who testified that voluntary certification programs are less effective than mandatory exams because, under a voluntary scheme, not all tour guides are held to the same standard. ECF No. 41-1, Banike Dep. 177: 13–23. With respect to plaintiffs' suggestion that the City operate or hire its own tour company, the City has presented evidence that Savannah, Georgia does not actually utilize this approach,

ECF No. 62-7, Lidy Aff. ¶¶ 3, 4, and even if they did, the court is not convinced that one municipalities adoption of an alternative would preclude a reasonable trier of fact from concluding that alternative was not "readily available."  The evidence also fails to conclusively establish whether the City could accomplish its goals through enforcement of fraudulent solicitation statutes.  It is questionable whether the City's fraudulent solicitation statute, which prohibits the making of "deceptive or misleading oral or written statement[s] or representation[s]" and "misrepresent[ing] the nature of [a] products [,]" Charleston Code § 21-232(a)–(b), covers all of the activity the City is concerned about—particularly, tour guides who are simply unknowledgeable, but not necessarily fraudulent.  Even if the City could enact a statute that covered the problematic activity, the City has presented evidence from Daniel Riccio, a former Charleston police officer, who avers that, in his experience, "tourist[s] who are victimized while traveling . . . are unlikely to pursue prosecution of the person who harmed them."  ECF No. 62-6, Riccio Aff. ¶ 7.  Plaintiffs have presented evidence that the city of Philadelphia, Pennsylvania utilizes this method, ECF No. 39-5, Reynolds Aff. ¶ 141, but again, one city's decision to adopt an alternative approach is hardly conclusive evidence of the approach's viability.  Finally, even if some of these alternative methods would be just as effective as the City's current licensing scheme, it seems very unlikely that any of these alternatives would burden "substantially" less speech than the current law, given that the current law burdens very little speech to begin with.  Thus, a reasonable trier of fact could find that the City did not forego less restrictive, available alternatives.

Therefore the court denies plaintiffs' motion for summary judgment.

# IV.  CONCLUSION

For the foregoing reasons, the court **DENIES** both motions for summary judgment.  Further, the court **GRANTS** in part and **DENIES** in part the motion to strike.

**AND IT IS SO ORDERED**.

**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**September 25, 2017**
**Charleston, South Carolina**