## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
## CHARLESTON DIVISION

| | | |
|---|---|---|
| KIMBERLY BILLUPS, MICHAEL WARFIELD, and MICHAEL NOLAN, | ) ) ) | |
| Plaintiffs, | ) ) | Civil No. 2:16-cv-00264-DCN |
| vs. | ) ) ) | **FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| CITY OF CHARLESTON, South Carolina, | ) ) | |
| Defendant. | ) ) | |
| _____ | ) | |

The J. Waties Waring Judicial Center in Charleston, South Carolina is on the National Register of Historic Buildings. There is a marker outside that proclaims it as the courthouse where Thurgood Marshall tried <u>Briggs v. Elliott</u>, one of the cases consolidated into the seminal U.S. Supreme Court case <u>Brown v. Board of Education</u> and heard by a three-judge panel including the courthouse's namesake J. Waties Waring. It sits at the "Four Corners of the Law," an intersection in downtown Charleston where the federal courthouse, the state courthouse, the City of Charleston City Hall, and St. Michael's Episcopal Church face each other. Every day, tour guides leading tourists from across the world in walking groups and in horse-drawn carriages pause at the Four Corners of the Law to talk about its significance. It is in this courthouse that the court heard testimony from numerous witnesses and considered voluminous evidence on the constitutionality of the City of Charleston's tour guide licensing law ("the licensing law") during a weeklong bench trial. And it is in this courthouse that the court reluctantly strikes down the licensing law as unconstitutional under the First Amendment of the United States Constitution.

1

# I. PROCEDURAL HISTORY

On January 28, 2016, plaintiffs filed a complaint alleging that the licensing law was unconstitutional under the First Amendment, both facially and as applied. Plaintiffs moved for a preliminary injunction and the City of Charleston ("the City") moved to dismiss the complaint. The court denied both motions on July 1, 2016. ECF No. 27. On January 27, 2017, the parties filed motions for summary judgment. The court denied both motions on September 25, 2017. ECF No. 79. Thus, this matter came to a head, and the court tried this case without a jury from April 9th, 2018 until April 12, 2018. During the bench trial, the court heard from multiple witnesses and reviewed voluminous evidence. Having considered the testimony and the exhibits admitted at trial, as well as the parties' pre-trial briefs and post-trial proposed findings and conclusions, the court now makes the following findings of fact and conclusions of law in accordance with Federal Rule of Civil Procedure 52(a).

# II. THE EVIDENCE AT TRIAL[1]

## A. The City of Charleston's Licensing Law

### 1. The Licensing Law

a. The City's tourism ordinances regulating the tourism industry have been in place since 1983. SUMF ¶ 3.[2] The stated purpose of the City's tourism ordinances is to "maintain, protect and promote the tourism industry and economy of the city."

---

[1] These findings of fact are based on the preponderance of the evidence presented to the court.
[2] The parties submitted a joint Statement of Undisputed Material Facts ("SUMF"). ECF No. 104.

SUMF ¶ 4.  It applies to all persons looking to be tour guides for hire within Charleston.  SUMF ¶ 14.

b.  Pursuant to Charleston City Code § 29-58, "No person shall act or offer to act as a tour guide in the city for hire unless he or she has first passed a written examination and is licensed by the city's office of tourism management as a registered tour guide."  SUMF ¶ 5.  Pursuant to Charleston City Code § 29-2, a "tour guide" is defined as "any person who acts or offers to act as a guide for hire through any part of" certain regulated districts of the City.  SUMF ¶ 6.  The definition of "tour guide" includes "pedestrians and persons within automobiles, motor vehicles or horse-drawn vehicles when the primary purpose of riding in such vehicles is not transportation, but touring the historic areas of the city." SUMF ¶ 7.  The City's Code defines "tour" or "touring" as "the conducting of or the participation in sightseeing in the districts for hire or in combination with a request for donations."  SUMF ¶ 8.

c.  Joseph P. Riley, Jr. ("Mayor Riley") was the Mayor of Charleston from December 1975 until January 2016.  Tr. 53:18–54:1.  He was the Federal Rule of Civil Procedure 30(b)(6) representative of the City.  Tr. 52:23–24.

d.  The licensing law was passed under Mayor Riley's tenure in 1983 as part of a package of ordinances to implement Charleston's first Tourism Management Plan.  Tr. 33:22–23.  The City requires tour guides to pass a written examination and obtain a valid business license before the City will issue a registered tour guide license card.  SUMF ¶ 12.

e. All of the questions on the written exam come from the Tour Guide Manual. Tr. 318:19–319:2.

f. To maintain their license, tour guides must take city-sanctioned continuing education courses or retake the exam. As an alternative to retaking the tour guide licensing exam, the City offers continuing education courses. Tr. 107:10–12. The City must either approve or offer the continuing education courses that tour guides must take to renew their tour guide license. Tr. 319:13–19. The City must "select or approve" the topics of those courses. Tr. 319:20–24. It is not only the City's courses that qualify as continuing education courses. Tr. 322:21–22. Other organizations such as the Preservation Society and Historic Charleston Foundation also provide courses that would qualify as continuing education courses, as does the College of Charleston. Tr. 322:5–20. However, if the City does not provide the course, the City must approve a course for it to qualify for credit towards recertification. Tr. 322:23–323:10. The City never mandated continuing education courses that compelled tour guides to discuss certain topics on their tours or required that tour guides "had to say this and they had to say that." Tr. 323:24–324:3.

g. The City conducted surveys in partnership with the Charleston Chamber of Commerce about the "constant" draw of historic sites and the history of Charleston for tourists, which was "formative" in creating the tourism management plan. Tr. 513:19–514:12. The City considered these studies to determine why tourists traveled to Charleston prior to the enactment of the licensing law. Tr. 529:24–530:8. These studies conducted by the Chamber of

4

Commerce confirmed that the draw was history and historic sites, which was the impetus for enacting the licensing law. Tr. 516:15–7.

h.  The Historic Charleston Foundation is a nonprofit foundation founded in the 1940s. Tr. 77:1–6. It is involved in "preservation and restoration," and advocates for historic preservation in Charleston. Tr. 380:21–381:11. The Historic Charleston Foundation prepared the questions on the written examination. Tr. 363:20–25. The City made no changes to the exam after it received it from the Historic Charleston Foundation. Tr. 364 6–9.

i.  The licensing law is only enforced on public streets. Tour guides may conduct tours on private property without a license. Tr. 252:7–19.

j.  The City does not dictate the type of content that tour guides talk about. Tr. 52:7–9. It does not provide tour guides with a script to follow on tours. Tr. 52:10–12. It does not force tour guides to say certain things on tours. Tr. 52:13–15. There is no provision in the licensing law that would allow the City to monitor what tour guides say on their tours. Tr. 118:16–21. The City does not review what tour guides say once they are fully licensed. Tr. 218:13–14. The City has never taken corrective action against a guide "in any way" based on the content of the tour. Tr. 365:21–24.

k.  Vanessa Turner Maybank ("Maybank") is the clerk of council for the City. Tr. 294:16–22. As clerk of council, she manages the portion of the tourism management division that deals with the examination of tour guides. Tr. 294:23–295:4. Maybank was also the Director of Tourism from 1984 to 1996 and

oversaw a portion of the City's Tourism Commission from 1986 to 2015. Tr. 295:5–20.

l. The Tourism Commission has an advisory role; it does not have the power to enact ordinances, change ordinances, or impose any requirement that is not contained in the ordinances. Tr. 359:21–360:5. The Tourism Commission has no authority with regard to the tourism ordinance. Tr. 412:20–413:9. The Tourism Commission met every two months, and meeting minutes from those meetings accurately encapsulate what happened during the meeting. Tr. 299:13–15.

m. Rhetta Mendelsohn ("Mendelsohn") was a member of the City's Tourism Commission from 2001 to 2009. Tr. 372:16–19. She was also the chair of the City's Tourism Subcommittee on Tour Guides. Tr. 309:1–10. As a member of the Tourism Commission, Mendelsohn was involved in putting together recertification classes for the licensing law, including suggesting subject areas for classes. Tr. 401:22–402:1.

n. Mendelsohn was also on the board of the Historic Charleston Foundation from 2006 to 2015. Tr. 380:14–18. Mendelsohn testified that the Historic Charleston Foundation was "vitally interested in tour guides knowing the city's history." Tr. 417:19–20.

**2. 2015 Amendments to the Licensing Law**

a. John Joseph Tecklenburg ("Mayor Tecklenburg") is the current mayor of Charleston. Tr. 203:16–20. He has held this position since early 2016. Tr. 203:21–22.

b.  In the spring of 2016, the City passed a number of amendments to the licensing law.  Tr. 203:23–204:1.  One of the amendments was the removal of the oral examination requirement.  Tr. 205:22–206:6.  Another amendment removed a provision of the law pertaining to tour escorts, who escorted large groups of tourists for safety purposes.  Tr. 206:16–19.  The category of temporary tour guide was deleted.  Tr. 222:18.  The passing rate on the written exam was changed from 80 to 70.  Tr. 222:21–22.  Registered tour guides were able to extend their license without retaking the exam.  Tr. 222:22–24.  The title of tour guide emeritus was established for a registered tour guide who held a tour guide license for 25 continuous years.  Tr. 222:24–223:1.  School groups were exempt from the requirement that walking tours for hire consisting of more than 20 people needed to be accompanied by a licensed tour guide.  Tr. 223:1–4.

c.  Mayor Tecklenburg testified that the temporary tour guide license was eliminated because the tour guide licensing exam was being offered more frequently and so there was no longer a need for a temporary license.  Tr. 223:9–16.

d.  As for the elimination of the oral exam, Mayor Tecklenburg testified that the oral exam was a "timing exercise to help the new tour guides" but the tour guide industry "could handle that" as opposed to the City.  Tr. 224:4–8.

e.  The passing grade was decreased to a 70 to make the grading scheme "consistent with" other grading schemes, where a 70 is traditionally a passing score.  Tr. 224:15–21.

f.  The recognition of a tour guide emeritus status was established to comport the tour guide industry with other industries such as real estate where based on

7

"experience and time in the industry" a professional no longer needs to take continuing education to maintain a license. Tr. 225:4–11.

g. Tour escorts were eliminated from the licensing law because the provision was mainly for public safety purposes, as groups with over 20 people in public right-of-ways could "easily lead to obstructing the sidewalk," but any groups of this size were school groups that were "not conducting a walking tour for hire." Tr. 226:9–227:6.

h. While the amendments to the licensing law were made at the same time as this lawsuit was filed, the amendments were not made to evade the lawsuit. Tr. 228:3–9.

**3. Tour Guide Manual**

a. Under the licensing law, tour guides must pass a written exam that exclusively tests material found in the Tour Guide Manual. SUMF ¶ 43. The Tour Guide Manual is, without appendixes, 483 pages long. Tr. 68:24–69:2. 200 of those pages consist of a street-by-street inventory of buildings. Tr. 69:315. 35 pages are dedicated to architecture and historical preservation. Tr. 69:16–19.

b. The Tour Guide Manual was prepared by the Historical Charleston Foundation, which received the contract to develop the manual through a competitive bid process. Tr. 362:9–17.

c. Mendelsohn was on the review committee of the Historic Charleston Foundation that reviewed the Tour Guide Manual for content and accuracy. Tr. 382:16–19. She also contributed content to the Tour Guide Manual. Tr. 382:20–21.

d.  The Tourism Commission also had a role in the development of the Tour Guide Manual. Tr. 362:18–20.  Specifically, after the Historic Charleston Foundation had completed "a quarter" of the manual, it asked the Tourism Commission to "take a look" at what had been done so far.  Tr. 362:20–363:6.  The Tour Guide Manual review committee included members of the Tourism Commission.  Tr. 388:17–389:19.  The Tourism Commission did not provide a specific list of topics to be included in the manual, nor did the Tourism Commission require the Historic Charleston Foundation to include any specific topic in the manual.  Tr. 363:7–12.

e.  After the Historic Charleston Foundation finished the Tour Guide Manual, no changes were made.  Tr. 363:13–19.

f.  The Tour Guide Manual places the symbol of a Palmetto tree beside "certain paragraphs or certain pictures" to indicate that a topic is "really important" and is more likely to be on the tour guide licensing exam.  Tr. 392:2–11.  Specifically, Mendelsohn testified that the Palmetto trees "were put there to give more emphasis to a particular house or a particular location . . . to give some sense of order to what was considered the most important and what was just more information."  Tr. 397:18–22.  The Palmetto tree symbol does not require that a tour guide must discuss that topic on the tour, as the City does not regulate what tour guides talk about during tours.  Tr. 420:3–10.

g.  The Tour Guide Manual begins with a letter from Mayor Riley that includes the sentence: "The honor of introducing the over 4 million visitors per year to the best our city has to offer goes to a special few who cherish Charleston's most

revealing secrets and have mastered her most telling stories."  Pl's Ex. 37, pg. 3.

The City makes no attempt to keep an "official list of the "most revealing secrets"

and "most telling stories" that tour guides must tell tourists—this is a decision left

to each individual tour guide.  Tr. 65:1–66:2.  Mayor Riley testified that each tour

guide "might have a different idea" of which of Charleston's stories were her

"most telling" and which "aren't."  Tr. 67:3–12.

### 4. Tourism in Charleston

a.  The Charleston economy is "deeply dependent" upon the success of the tourism

industry.  Tr. 119:12–13.  Tourism generates $7.37 billion in economic impact to

the Charleston area economy and is its number one industry.  Tr. 444:7–11.  Since

the early 1980s, Charleston has seen "significant growth" in terms of visitors,

attractions, and restaurants.  Tr. 444:19–23

b.  Charleston ranks highly as a tourist destination, and numerous publications have

awarded it accolades in recent years.  Tr. 448:7–449:17.  To name just a few,

Travel and Leisure ranked Charleston the number one city in the world for

visitors in 2016 and Conde Nast Traveler ranked Charleston as the number one

city in the United States for visitors in 2018—and for the seven years preceding it.

SUMF ¶ 2.

c.  It is not unreasonable for the City to expect that tour guides will receive questions

from tourists about architecture and historic preservation.  Tr. 73:18–23.  Mayor

Riley has 42 years of experience talking to visitors about what "they saw, what

they liked, what was interesting."  Tr. 74:21–75:4.  As such, he is a credible

source with considerable expertise on what tourists look for and what they ask about in tours.

d.  Helen Hill ("Hill") is the Chief Executive Officer of the Charleston Area Convention and Visitors Bureau ("CVB"), a 501(c)(3) organization that is a public-private partnership for marketing the City of Charleston. Tr. 435:21–436:14. Hill testified that based on her personal knowledge of the tourism industry, it was Charleston's "history" and "sense of place" that motivates most visitors to come to Charleston. Tr. 440:5–23. Hill testified that based on her "entire career" at CVB "history and historic sites is always the number one reason that people visit Charleston." Tr. 467:17–19.

e.  Hill went on to say that it was not only a "unique place in history" and "well preserved amazing architecture," but also "fantastic foods" that motivate tourists to come to Charleston. Tr. 442:11–22. Indeed, Hill testified that tourists not only "want to enjoy tours," but also "have great dinners" and "see our historic sites." Tr. 442:18–25.

f.  Tourists come to Charleston for various reasons, including the architecture, the food, and the ghost stories. Tr. 100:10–20.

g.  CVB sells tours in Charleston. Tr. 445:23. CVB staff sold $2.3 million worth of tour tickets at the visitor center last year. Tr. 448:3–6.

h.  Hill testified that CVB uses "peer cities" to "look carefully at particular areas," of improvement in Charleston. Tr. 473:20–474:1. Hill testified that CVB identifies "peer cities" based on specific areas such as incentive travel or the meeting and connection business. Tr. 474:2–21. For example, New Orleans is a "peer city" in

tourism and promotion. Tr. 474:2–5. Savannah is a "peer city" in the meeting and connection business and air service development. Tr. 474:12–18. San Francisco is also a "peer city." Tr. 476: 13–17. Austin is a "peer city" for international travel and music promotion. Tr. 476:18–21. Many of these "peer cities" have also won magazine awards. Tr. 477:1–10.

### 5. Tourism Management Plans and Amendments

a. Charleston developed the licensing law as a part of a Tourism Management Plan, which was the first of its kind in the United States. Tr. 57:16–22. The first Tourism Management Plan was developed in 1978 when tourism was becoming an "increasingly" important part of the city's economy. Tr. 108:5–14. Mayor Riley testified that in 1978, when the first Tourism Management Plan was implemented, the main attractions driving tourism in Charleston were "preservation achievements" such as the historic district. Tr. 109:11–25.

b. The Tourism Management Plan was envisioned to manage the growing tourism industry in Charleston. Tr. 58:2–10. In adopting Tourism Management Plans, the City balanced the "growing and successful tourism industry" and the desire to keep Charleston as a "quality place in which to live, to do business." Tr. 59:7–16.

c. As tourism grew, there was a "growing angst" among residents about the "lack of Management or organization" in regulating tourism. Tr. 108:11–16. The Tourism Management Plan addressed issues that were leading to consternation from area residents such as carriage horse tours operating from White Point Gardens, and that buses of any size carrying tourists could go down any street in Charleston. Tr. 58:7–14. To mitigate these particular problems, for example, the

Tourism Management Plan initiated a "zone" system to reduce overcrowding of carriages on the same few streets, as well as implementing perimeter routes for larger tourist buses. Tr. 58:15–25. Another part of the first Tourism Management Plan was the visitor's accommodations ordinance, which limited where hotels could be placed in those areas that were "pedestrian connected." Tr. 112:1–18.

d. The City utilized a comprehensive process to come up with a Tourism Management Plan, including appointments of a "broad committee" of representatives of the affected neighborhoods. Tr. 123:15–17. The committee members held public hearings, and then presented recommendations to the City Council. Tr. 123:23–124–2. For those provisions of the plan that require the "effect of law," City Council passed ordinances. Tr. 124:2–6.

e. During Mayor Riley's tenure, as the City "grew and tourism industry grew and changed" the City had four Tourism Management Plans, with the last one being the 2015 Tourism Management Plan. Tr. 60:2–12. These new iterations of the plans are not on a "particular timetable." Tr. 122:20–22. None of the Tourism Management Plans during Mayor Riley's tenure included a repeal of the licensing law's oral exam requirement. Tr. 61:18–21. The 2015 Tourism Management Plan included appropriations to hire more tourism enforcement officers to "help handle complaints" and observe when "laws were violated" such as carriages "in the wrong zone after hours." Tr. 124:5–12.

B. **Alternatives to the Licensing Law**

1. **Business License**

a. There are a number of different businesses that interact with tourists in Charleston, and all of these businesses must have a business license.  Tr. 235:7–10.

b. All tour guides must have a business license.  Tr. 235:16–17.

c. The City can take away a business license under certain circumstances.  Tr. 260:22–24.

## 2. Deceptive Solicitation Ordinance

a. Daniel Riccio ("Riccio") is the Director of Livability in the City of Charleston. Tr. 250:2–5.  One of Riccio's duties as Director of Livability is to enforce Chapter 2(a) of the City of Charleston Code, which contains all of the ordinances applicable to the tourism industry, including the requirement that tour guides hold a tour guide license.  Tr. 250:10–20.  Riccio is also the official in charge of enforcing the City's ordinance against deceptive, misleading and aggressive commercial solicitation.  Tr. 259:19–23.

b. Charleston has a deceptive solicitation ordinance which prohibits the making of "deceptive or misleading oral or written statement[s] or representation[s]" and "misrepresent[ing] the nature of [a] products."  Charleston Code § 21-232(a)–(b)

c. The deceptive solicitation ordinance was implemented in response to timeshare hawkers who would set up misleading storefronts and get tourists to sign up for a timeshare "under a lot of pressure."  Tr. 139:3–14.

d. The deceptive solicitation ordinance is enforced in one of two ways.  Tr. 265:8–9. First, an individual files a complaint and wants to testify that they experienced an aggressive solicitor.  Tr. 265:9–11.  Second, tourism enforcement officers would

observe a location where the activity is occurring to determine whether any "aggressive" solicitation is occurring.  Tr. 265:11–20.

### C.  Plaintiffs

#### 1.  Kimberly Billups

a.  Plaintiff Kimberly Billups ("Billups") planned to start her own tour guide business, Charleston Belle Tours, in 2015.  Tr. 40:2–14.  She took a number of steps to get Charleston Belle Tours "off the ground," including purchasing a telephone business number, an antebellum period costume, a credit card reader and a domain name.  Tr. 40:15–20.  As a tour guide, Billups takes her customers around town and tells them about the history of the city and of the character that she portrays, a character named Nancy Bostick de Saussure who "spent a lot of her life" in Charleston.  Tr. 46:13–17.

b.  Billups also talks about the Civil War and "tells a lot of jokes."  Tr. 46:17–19

c.  Billups receives questions on her tours, of which "some" are "historical questions" but one of her "biggest questions" is where to get "the best shrimp and grits."  Tr. 47:2–10.

d.  During her tours, Billups dresses in an antebellum dress.  Tr. 48:15–21.

e.  To obtain a tour guide license, Billups was required to pass a written test and an oral exam.  Tr. 41:6–8.  Billups obtained the Tour Guide Manual from the City, paid $50 to take the test, and studied "five to six hours every single day" from September 2015 until November of 2015.  Tr. 41:17–42:12.  Billups received a 70% on the written exam, which was below the 80% score threshold necessary to qualify for the oral exam at the time.  Tr. 43:11–17.  Because Billups did not pass

15

the written exam, she was unable to get Charleston Belle Tours "up and running." Tr. 43:19–22.

f.   Of the questions on the two-hour written test, Billups remembers that one question was on the architecture of a funeral home. Tr. 42:12–23. Billups testified that based on the types of stories she planned to tell as part of Charleston Belle Tours, the architecture of a funeral home was in irrelevant to her tour guide business. Tr. 42:19–43:2.

g.   After Billups failed the written exam, she learned from the City of Charleston Tourism Bureau about the possibility of getting sponsored by other tour guide businesses in the area to become a temporary tour guide. Tr. 44:2–14. However, a tour guide business did not sponsor Billups to become a temporary tour guide, and Billups was unable to take the temporary test and become a temporary tour guide. Tr. 44:6–28.

h.   Billups eventually obtained a tour guide license from the City when the City changed the licensing law to lower the scoring on the written exam to a 70 and did away completely with the oral exam. Tr. 44:20–24. Billups began studying for the tour guide exam in September 2015 and obtained her license in May 2016. Tr. 45:1–3.

i.   Billups's tour guide license is valid for three years, after which she must either retake the exam or take a series of continuing education course from a selection of courses approved by the City. Tr. 45:7–15.

j.   As a result of the requirements to become a licensed tour guide that is imposed by the licensing law, Billups testified that Charleston Belle Tours has been "greatly"

affected.  Tr. 46:1–5.  For example, Billups has been "unable to hire on very knowledgeable people that have shown interest in working" for Charleston Belle Tours, and that this is "a very big deal."  Tr. 46:2–4.

### 2.  Michael Joseph Nolan

a.  Plaintiff Michael Joseph Nolan ("Nolan") is a resident of Charleston.  Tr. 182:11–18.  Nolan wished to pursue part-time work as a tour guide.  Tr. 183:15–17.  Based on a course that he took in Irish and Irish-American history, Nolan began planning a tour based on the Irish-American experience in Charleston.  Tr. 184:8–16.  This tour would include Hibernian Hall, where the old Irish neighborhoods were, and the Irish memorial on Charlotte Street among other attractions.  Tr. 184:18–23.

b.  Nolan purchased the Tour Guide Manual in September and studied it for hours every day until the test in November.  Tr. 185:21–24.  He focused on "little Palmetto trees next to certain topics" in the Tour Guide Manual, as those topics were more likely to appear on the licensing exam.  Tr. 186:18–21.

c.  Nolan failed the exam, receiving a 64%.  Tr. 187:20–24.

d.  Nolan does not currently hold a tour guide license.  Tr. 188:3–4.

### 3.  Michael Thomas Warfield

1.  Michael Thomas Warfield ("Warfield") is a plaintiff in this case.  Tr. 236 3–6.  He is an insurance broker who is currently training to be a tour guide.  Tr. 236:18–21.

2.  Warfield has been volunteering at the Powder Magazine for the past six years, where he discusses the history and significance of the building, and what events

were happening in Charleston while the Powder Magazine was being built. Tr. 237:19–238:5. No license is required to volunteer at the Powder Magazine. Tr. 238:6–9.

3. Warfield decided that he wished to become a licensed tour guide to conduct pub tours. Tr. 238:22–239:4.

4. Warfield failed the first exam, receiving a 74%. Tr. 240:1–3. He took the exam a second time three months later, the next time that the exam was offered. Tr. 240:16–18. The second time that he took the exam, Warfield received a 68%. Tr. 242:5–16.

5. When the licensing law was amended in April 2016, Warfield was able to become a licensed tour guide because the 74% on his first test qualified under the new retroactively-applicable passing threshold of 70. Tr. 242:18–22.

6. From the time that he started studying for the exam until he obtained his license, Warfield waited a year and a half to begin giving tours. Tr. 243:14–16.

**D. Tour Guide Licensing in Other Cities**

1. Paula Reynolds ("Reynolds") is a tour organizer who operates American Tour Guide Association, an organization of guides that provide tours. Tr. 152:11:152:19–153:6. She has worked as a tour organizer in approximately 50 jurisdictions. Tr. 157:18–20. Of these, New Orleans and Williamsburg require a license to become a tour guide. Tr. 157:2–8. Other jurisdictions such as Philadelphia "had a suggested license" that was "never enforced." Tr. 157:12–15. Savannah had a tour guide license but it was dropped. Tr. 157:15–16. Of the

remaining jurisdictions, Reynolds testified that "[v]ery few cities" have tour guide licensing. Tr. 157:18–23.

2. Esther Banike ("Banike") is a tour guide in Chicago and the vice president of the World Federation of Tourist Guide Associations ("WFTGA"), an organization dedicated to the representation of tour guides. Tr. 530:24–532:18. Chicago does not have a mandatory licensing scheme for tour guides. Tr. 537:15–18. Banike does hold a certification from the Chicago Tour Professionals Association ("CTPA"), which includes shadowing "qualified guides," a mentoring process, and a three-part test. Tr. 537:19–Tr. 538:5. The three-part test includes a written test about "places and history," a site recognition test and a road routing test. Tr. 538:8–18.

3. Banike testified that she sought out the CTPA certification credential because "you should seek some credential to prove that you can do the job," but only 25-30% of tour guides who are members of CTPA actually take the exam and become certified. Tr. 541:2–11.

4. Based on her role as an officer of the WFTGA, Banike testified that unqualified or unscrupulous guides were a problem in member countries across the world. Tr. 557:1–558:6. Banike testified that certain locales attracted unqualified guides, specifically: "historical significance," "beautiful architecture," "affluent tourists," and "great weather." Tr. 561:19–562:7. The court takes judicial notice that Charleston possesses all of these attractions.

### III.    DISCUSSION

The summary judgment order left open the two major issues in this case: (1) the appropriate level of scrutiny; and (2) whether the City's licensing law passes that level of scrutiny.  As at summary judgment, during the bench trial, plaintiffs argued that the City's licensing law should be subject to strict scrutiny because it is a content-based regulation of speech and that it fails strict scrutiny.  In the alternative, the plaintiffs argue that the licensing law fails intermediate scrutiny.  In any event, plaintiffs contend that the licensing law violates the First Amendment.  The City disagrees.  The court does not need to determine whether the licensing law is content-based, as it finds that the licensing law fails to pass constitutional muster even under the more lenient intermediate scrutiny standard.

### A.    First Amendment

"The First Amendment, applicable to the States through the Fourteenth Amendment, prohibits the enactment of laws 'abridging the freedom of speech.'"  Reed v. Town of Gilbert, Ariz., 135 S. Ct. 2218, 2226 (2015) (quoting U.S. Const., Amdt. 1).  Thus, "a government, including a municipal government vested with state authority, 'has no power to restrict expression because of its message, its ideas, its subject matter, or its content.'"  Id. at 2226 (quoting Police Dept. of Chicago v. Mosley, 408 U.S. 92, 95 (1972)).  In the court's order denying a preliminary injunction, the court established that the licensing law "implicates speech, and some form of First Amendment scrutiny is necessary."  Billups v. City of Charleston, 194 F. Supp. 3d 452, 462 (D.S.C. 2016).   And the public streets and sidewalks on which tours are coonducted are public forums.

Schenck v. Pro-Choice Network of W. N.Y., 519 U.S. 357, 377 (1997) ("[S]peech in public areas is at its most protected on public sidewalks . . . .").

Courts have distinguished between two categories of laws that regulate speech—content-based regulation and content-neutral regulation.  Courts apply different levels of scrutiny to the two categories of speech regulation.  "Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests."  Id.  "In contrast, [laws] that are unrelated to the content of speech are subject to an intermediate level of scrutiny, [] because in most cases they pose a less substantial risk of excising certain ideas or viewpoints from the public dialogue."  Turner Broad. Sys., 512 U.S. at 642 (citing Clark v. Community for Creative Non–Violence, 468 U.S. 288, 293 (1984)).  For a law to meet the requirements of intermediate scrutiny, it "must be 'narrowly tailored to serve a significant governmental interest.'"  McCullen v. Coakley, 134 S. Ct. 2518, 2534 (2014) (quoting Ward v. Rock Against Racism, 491 U.S. 781, 796 (1989)).

### B.  Appropriate Level of Scrutiny

As the court has already determined that the tour guide speech at issue in this case is protected speech, it must now determine what level of scrutiny to apply.  Plaintiffs first ask the court to determine whether the licensing law was imposed with a content-based purpose or justification.  Both parties spent substantial briefing and testimony on whether the City's motivation in enacting the licensing law was content-neutral.  The court sees no need to answer that question.  Even assuming that the City's motive was content-

neutral,[3] the court finds that the licensing law fails to pass constitutional muster even under the more lenient intermediate scrutiny standard applied to content-neutral laws.

## C.    Narrow Tailoring

In order to prevail on the constitutionality of the licensing law, the City must demonstrate that it has a "significant interest" and that the licensing law is "narrowly tailored" to serve that interest. In the summary judgment order, the court established that the City has a "significant interest" in protecting its tourism industry and its visitors. Billups, 194 F. Supp. 3d at 468. The issue now becomes whether the licensing law materially advances and is narrowly tailored to serve those interests and whether it leaves ample alternative channels of communication. To answer this, the court is required to consider whether the City has provided "actual evidence" it did not forego readily available, less intrusive means of protecting those interests. It is forced to conclude that the City has failed to provide evidence to satisfy the evidentiary burden of "prov[ing] that it actually tried other methods" as required by Reynolds v. Middleton, 779 F.3d 222 (4th Cir. 2015) (emphasis added).[4] Because the City has failed to present any evidence that it ever actually "tried" to solve the problem of harm caused to tourists and the tourism economy by unscrupulous tour guides through less intrusive, readily available methods as

---

[3] Like the testimony about the oral exam provision, the testimony about the temporary tour guide license is relevant only if the court chose here to analyze the City's motive in enacting the licensing law. Since the court finds it unnecessary to delve into that analysis, it discusses neither the oral exam provision nor the temporary tour guide license.

[4] Curiously, the City failed to even mention this holding of Reynolds in its proposed order. Ignoring recent binding precedent does not make it go away. The City, like this court, is bound by Reynolds. Unfortunately, Reynolds dictates the outcome in this case.

required by <u>Reynolds</u>, the court has no choice but to find that the licensing law fails the requirements of narrow tailoring.[5]

Intermediate scrutiny standard is the test generally applicable to content-neutral regulations. In <u>Clark</u>, the Supreme Court set forth the rule that content-neutral laws pass constitutional muster only if they are "narrowly tailored to serve a significant governmental interest" and "leave open ample alternative channels for communication of the information." The Court reiterated this standard in <u>McCullen</u>. "[B]y demanding a close fit between ends and means, the tailoring requirement prevents the government from too readily 'sacrific[ing] speech for efficiency.'" <u>McCullen</u>, 134 S. Ct. at 2534–35 (quoting <u>Riley v. Nat'l Federation of Blind of N.C., Inc.</u>, 487 U.S. 781, 795 (1988)). Under intermediate scrutiny, the government's interest must be "significant." <u>See</u> <u>Id.</u> at 2529. Ultimately, for a content-neutral regulation "to be narrowly tailored, it must not 'burden substantially more speech than is necessary to further the government's legitimate interests.'" <u>Id.</u> at 2535 (quoting <u>Ward</u>, 491 U.S. at 799). While this does not require that a subject regulation "'be the least restrictive or least intrusive means of' serving the government's interests, . . . the government still 'may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals.'" <u>Id.</u> (quoting <u>Ward</u>, 491 U.S. at 798, 799).

The Fourth Circuit recently set forth a very substantial evidentiary burden for the government to survive an intermediate scrutiny analysis in <u>Reynolds</u>. In <u>Reynolds</u>, the

_____

[5] Of course, almost all of the First Amendment jurisprudence that is applicable in this case post-dates the City's first Tourism Management Plan. Thus the court cannot fault the City for not "trying" alternatives since the state of the law in 1983 did not require it do so.

Fourth Circuit held that intermediate scrutiny "does indeed require the government to present actual evidence supporting its assertion that a speech restriction does not burden more speech than necessary; argument unsupported by evidence will not suffice to carry the government's burden." Reynolds, 779 F.3d at 229. Reynolds went on to hold that the burden of proving narrow tailoring requires the government to "prove that it actually tried other methods to address the problem." Id. at 231 (emphasis in original).

In Reynolds, the Fourth Circuit held that an ordinance that banned highway solicitation violated the First Amendment. Reynolds, 779 F.3d at 229. In doing so, the Fourth Circuit found it persuasive that the County presented no evidence showing that it ever tried to use available alternatives to address its safety concerns relating to the unobstructed use of its highways. Id. Specifically, the Reynolds court held that "the burden of proving narrow tailoring requires the County to prove that it actually tried other methods to address the problem." Reynolds, 779 F.3d at 231 (emphasis in original). The Reynolds court went on to hold that the government must "show that it seriously undertook to address the problem with less intrusive tools readily available to it [ ] and must demonstrate that such alternative measures . . . would fail to achieve the government's interests, not simply that the chosen route is easier." Id. at 231–232.

The Fourth Circuit held that the County "simply presented no evidence showing that it ever tried to use the available alternatives to address its safety concerns," and that "[w]ithout such evidence" "the County cannot carry its burden of demonstrating that the Amended Ordinance is narrowly tailored."[6] Id. at 232 (emphasis in original). It appears

---

[6] The court takes this opportunity to note the lack of clarity provided by the Fourth Circuit in Reynolds as to what is required for the City to demonstrate that it "tried" available alternatives. That is, it is unclear whether the Fourth Circuit's explicit

that no court has yet applied this holding of <u>Reynolds</u>, and <u>Reynolds</u> itself does not define what it means: (1) for a government to have "tried to use" alternatives, or (2) how expansive the scope of "available alternatives" is that a government must demonstrate that it tried. But this court is required to follow the plain language of this rule in <u>Reynolds</u>. The City's lack of evidence that it ever actually considered—let alone tried— less speech-restrictive alternatives as required by <u>Reynolds</u> dooms the licensing law. As the court has already explained, the City is not required to show that it "tried or considered <u>every</u> less burdensome alternative." <u>Billups v. City of Charleston, S.C.</u>, 2017 WL 4238233, at *11 (D.S.C. Sept. 25, 2017) (emphasis added). But it must show that "it did not forego readily available, less intrusive means of protecting those interests." <u>Id.</u> As explained below, the City has no evidence that it ever even considered <u>any</u> less-restrictive alternative than the licensing law to address its concerns about tourist safety or its tourism economy. This failure to even "consider" less-restrictive means to address its concerns certainly fails the clear rule in <u>Reynolds</u> that the City must "try" to use available less restrictive alternatives.

---

use of the word "tried" in <u>Reynolds</u> demonstrates its intent that governments actually implement several variations of alternative laws before arriving at the best-suited—albeit speech-restrictive—regulation or if it is a mandate that governments prove that they truly did "consider" various alternatives before enacting speech-restrictive regulations. The government could fulfill its evidentiary burden of "considering alternatives" by demonstrating that it explored policies of peer cities as memorialized in a report or discussed the merits and drawbacks of various less-restrictive options at meetings as evidenced by meeting minutes. But if it is the former, then <u>Reynolds</u> sets a high bar for what a government must prove for a law to be "narrowly tailored" in the context of an intermediate scrutiny analysis. Of course, here the City did not even consider any alternatives when it enacted or amended the licensing law so the court need not delve into this inquiry. But courts and governments would benefit from further clarification on how to apply this holding of <u>Reynolds</u>.

Admittedly, the City presented plentiful testimony during the bench trial about why the City feels that alternatives would not be as effective as the licensing law. For example, Mayor Riley testified about Charleston's deceptive solicitation ordinance which was implemented in response to timeshare hawkers who would set up misleading storefronts and get tourists to sign up for a time share "under a lot of pressure." Tr. 139:3–14. Mayor Riley testified that the deceptive solicitation ordinance "would not be" as effective at addressing the City's goal of having qualified tour guides who do not scam tourists because disappointed tourists will not "follow up" by submitting complaints so the City can enforce the deceptive solicitation ordinance. Tr. 140:10–23. Due in part to the relatively low price of a tour—$25 or $50—disappointed tourists are, Mayor Riley testified, less likely to write a letter about a tour guide that would allow the City to enforce the deceptive solicitation ordinance as compared to tourists who spent thousands of dollars on a time share. Tr. 141:2–19. Instead, Mayor Riley speculated those tourists will "go home and tell people you got ripped off in Charleston."[7] Tr. 140:23–25.

When asked if the deceptive solicitation ordinance could be used against a tour guide who "misled customers in their solicitation," Riccio replied that it would be "really difficult to enforce" against tour guides and that the ordinance is "intended for the

---

[7] Even if a tourist takes an unsatisfactory tour, it is not at all clear that the tourist would not return to Charleston or recommend Charleston as a tourist destination. For example, Mendelsohn recounted a story where she personally had taken a tour where she felt she did not get her money's worth. Tr. 424:5–9. She recounted a trip to Camden, South Carolina, the second-oldest city in the state, where she was given inaccurate information on a tour. Tr. 424:14–16. Mendelsohn said that she paid the Camden tour guide "a lot of money for pretty much nothing," and it was a "lousy experience out with someone who was putting herself out there as an experienced knowledgeable guide," but that she would still "tell people to go to Camden" because "Camden is a charming place." Tr. 6:21–427:12.

aggressive activities" of the timeshare hawkers. Tr. 260:2–13. Riccio further testified that it would be "impractical from an enforcement standpoint" to use the deceptive solicitation ordinance to "try and have every tour guide followed" in an effort to monitor any "aggressive" behavior by tour guides.[8] Tr. 266:5–13. But Riccio did testify about how a tourism enforcement officer should respond if they are told about an unlicensed tour guide leading a tour. Tr. 254:1–4. That is, the enforcement officers should follow the group at a respectable distance and "follow up" with the unlicensed tour guide after the tour ends. Tr. 254:6–8.

Based on his experience as an investigator, Riccio testified that tourists were "very reluctant" to prosecute a case, as they did not want to incur the "financial costs and burdens and leave work." Tr. 262:11–21. However, Riccio also testified that tourists who were victim of tourist-related crimes also "didn't want to come back because of the negative impact they experienced." Tr. 262:19–25. Specifically, tourists did not want to "rehash" what they had been through if it involved "com[ing] back to a place where they have a negative memory." Tr. 264:12–15. Given these barriers to tourists being involved in the prosecution of tourist-related crimes, Riccio testified that the licensing law is a "proactive mechanism to prevent a crime from occurring," that is in place to "prevent a victim from being defrauded." Tr. 263:12–14. But the City presented no evidence that it had ever <u>actually tried</u> to use the deceptive solicitation ordinance to combat complaints

---

[8] After the most recent iteration of the Tourism Management Plan in 2015, the City included appropriations to hire more tourism enforcement officers to "help handle complaints" and observe when laws were violated such as carriages "in the wrong zone after hours." Tr. 124: 5–12. The City provided no evidence why this increased number of tourism enforcement officers could not also police unscrupulous tour guides.

from tourists. This is what <u>Reynolds</u> demands, not a post-hoc explanation for why an alternative would be impractical.

The City also has a business license program. Riccio did testify that the City's existing business license requirement, which every tour guide must have, would not be an effective enforcement tool in ensuring tour guides are qualified to give tours. Tr. 260:25–261:3. Specifically, he testified that the business license would also be an ineffective measure because when the City revokes a business license, that individual could establish another LLC through someone else and be granted a business license under a different name, allowing that individual to continue to have a tour guide business. Tr. 264:19–23.

Another alternative is a voluntary certification program. Mayor Riley testified that a voluntary certification program "most certainly" would not achieve the City's stated purpose of protecting and promoting the tourism industry. Tr. 136:11–19. Specifically, Mayor Riley testified that a voluntary certification program would not have "the accuracy or the excellence or the quality" of the mandatory certification program, that "[i]t would fail" and speculated that the "tourism industry and [Charleston's] economy would suffer." Tr. 136:20-137:2. Moreover, when asked about the effectiveness of a voluntary certification program, Riccio opined that a voluntary scheme would not be an "effective preventive measure tool" because it would be "impractical." Tr. 263:21–264:2. Furthermore, Banike testified that the "most effective solution to the problems caused by unqualified or unscrupulous tour guides "was a "mandatory study course" and corresponding exam. Tr. 563:2–10. This mandatory licensing was the 'most effective' solution, Banike testified, as it as the "only way" to ensure that" guides who were wearing the license have gone through the appropriate training. Tr. 564:4–11.

Banike testified that she could not "think of any way except for a mandatory licensing exam" to ensure that all tour guides had the basic knowledge to provide a competent service for paying customers. Tr. 566:4–8. A voluntary certification program would not, Banike testified, achieve this goal.[9] Tr. 566:9:12. Nevertheless, while Banike testified that the WTAFA "would like to see mandatory exams," she also testified that it would "accept a voluntary certification also based on some kind of exam." Tr. 547:24–548:12. Indeed, of the 79 full members of the WFTGA, only approximately 55% have a mandatory licensing scheme. Tr. 565:1–18. Banike further testified that credentials like voluntary certification were important for being hired. Tr. 574:9–12. However, again, there is no evidence that the City considered this—or any other alternative—when it enacted the licensing law.

Hill testified that there was no city in the United States with a tourism industry that was "substantially similar" to Charleston's because "[t]here is no city in the United States like Charleston, South Carolina." Tr. 468:22–469:3. Specifically, Hill testified that Charleston "holds a unique place, and there is no other destination like Charleston that holds that place "because of Charleston's "Revolutionary War history and Civil War history" as well as its status as a "preserved destination." Tr. 469:2–13. In one sense, it is true that there is "no other city like Charleston." Tr. 146:24–25. But there are certainly similarly situated cities, in terms of size and tourism, and it is to these cities that court now turns. Baltimore has a voluntary certification program administered by the Baltimore Heritage Association, wherein tour guides who pass a take-home exam receive

---

[9] This court finds it a bit ironic that Banike asserts this position in light of the fact that her hometown Chicago has a voluntary certification program and a "booming" tourist economy. Tr. 537:15–18; Tr. 572:16–18.

a tour guide certification. Tr. 156:7–13. Chicago has a voluntary licensing scheme and a "booming" tourism economy. Tr. 537:15–18; Tr. 572:16–18. The fact that so many other cities—many of which Charleston considers to be "peer cities"—did not find it necessary to impose a mandatory licensing regime leads this court to echo the observation of the court in Edwards v. D.C., 755 F.3d 996, 1000 (D.C. Cir. 2014), which confronted a similar First Amendment challenge against a tour guide licensing exam that "scores of other U.S. cities [] have determined licensing tour guides is not necessary to maintain, protect, or promote the tourism industry." Edwards, 755 F.3d at 1004.

When asked if there was "any other way" to ensure that tour guides had basic knowledge, Mayor Riley replied there was "no other way." Tr. 118:1–4. But what is dispositive of the narrow tailoring inquiry under Reynolds is the fact that there is no evidence that the City never actually tried to use an alternative. The City did not investigate or study any alternative to requiring a mandatory tour guide license and exam. Tr. 95:13–17. The City also did not investigate or study any alternative to requiring the passage of a written exam to qualify for a tour guide license. Tr. 95:18–21. Mayor Riley testified that it would be "ridiculous" for the City to hire its own tour guides, but the City has no evidence that it ever investigated that option as an alternative. Tr. 142:17–143:13. Furthermore, CVB is a public-private partnership funded in part by the City that sells its own tours in Charleston. Tr. 445:23. Hill testified about the tourist level of satisfaction with the tours sold at the visitor center, that tourists were "always thrilled with the quality and with the value they receive, but "most importantly" tourists were satisfied with "the fact that they have a really great time." Tr. 447:23–448:2.

Ultimately, the City presented no evidence that it ever investigated much less "tried" any less restrictive alternative.  Under the standard articulated in <u>Reynolds</u>, without evidence that it actually tried less restrictive alternatives the City cannot carry its burden under narrow tailoring of demonstrating that existing laws such as the deceptive solicitation ordinance or a less speech-restrictive alternative such as a voluntary certification scheme could not prevent the problems addressed by the licensing law.  The testimony presented during the trial about the respective impracticalities of using, for example, the deceptive solicitation ordinance or a voluntary certification scheme, is post-hoc justification for the licensing law.  Under <u>Reynolds</u>, the lack of evidence that the City actually "tried" less-restrictive alternatives forces this court to reluctantly conclude that because the licensing law is not narrowly tailored, it fails intermediate scrutiny and must be struck down.

## IV.  CONCLUSION

The licensing law imposes real burdens on those hoping to be tour guides in Charleston.  Under the law, tour guides must pass a written test that exclusively tests material found in the Tour Guide Manual, a nearly 500 page document.  To maintain their licenses, tour guides must either take continuing education courses sanctioned by the City or retake the written exam.  The law thus restricts the speech of those hoping to give paid tours who have not passed the written exam or taken continuing education courses as required by the City.  The law applies to all tour guides who wish to give paid tours within Charleston's historical district, a lucrative profession in a city where tourism is the most profitable industry.  But the record demonstrates that the City never investigated or tried to use any less speech-restrictive alternatives.  Even under the more lenient intermediate scrutiny standard of review, the court is unable to find that the licensing law is narrowly tailored under the evidentiary standard demanded by McCullen and Reynolds.  Unfortunately, the court is constrained by the current state of the law.  It has no choice but to strike the licensing law down as unconstitutional under the First Amendment.[10]

---

[10] In striking down the licensing law, this court follows—as it must—binding authority about the reach of the First Amendment.  But it takes this as an opportunity to posit that this case is an example of the First Amendment run amok and question whether the paid tour guide speech that is at issue in this case is the type of speech that the First Amendment is intended to protect.  The court remains convinced that "paid tour guide speech is not a form of expression that '[has] historically been [ ] closely associated with the transmission of ideas.' " McCullen, 134 S. Ct. at 2536.  In proposing that courts should be able to consider the type of speech in determining the level of protection that it deserves, the court echoes Justice Kagan's recent dissent in Janus v. Am. Fed'n of State, Cty., & Mun. Employees, Council 31, 138 S. Ct. 2448 (2018):

> Speech is everywhere—a part of every human activity (employment, health care, securities trading, you name it).  For that reason, almost all economic

**AND IT IS SO ORDERED**.

_____
DAVID C. NORTON
UNITED STATES DISTRICT JUDGE

August 3, 2018
Charleston, South Carolina

---

and regulatory policy affects or touches speech.  So the majority's road runs long.  And at every stop are black-robed rulers overriding citizens' choices.  The First Amendment was meant for better things.  It was meant not to undermine but to protect democratic governance.

Id. at 2501–2502.  It saddens the court to be one of those "black-robed rulers overriding citizens' choices."  And it agrees that the First Amendment was "meant for better things."